# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PANINI AMERICA, INC.

    *Plaintiff,*

    v.

FANATICS, INC.,
FANATICS, LLC,
FANATICS COLLECTIBLES
INTERMEDIATE HOLDCO, INC.,
FANATICS SPV, LLC, and
FANATICS HOLDINGS, INC.

    *Defendants.*

_____/

Case No. 8:23-cv-1721

**Permanent Injunctive
Relief Requested**

**Declaratory Relief Requested**

**Demand for a Jury Trial**

## COMPLAINT FOR PERMANENT INJUNCTIVE, DECLARATORY, AND MONETARY RELIEF

Panini America, Inc. ("Panini") sues Fanatics, Inc.; Fanatics, LLC; Fanatics Collectibles Intermediate Holdco., Inc.; Fanatics SPV, LLC; and Fanatics Holdings, Inc. (collectively, "Fanatics"); and alleges:

## I.    Nature of the Case

1.    Companies for decades have competed to produce and sell new trading cards for players of teams in Major League Baseball (MLB), the National Basketball Association (NBA), and the National Football League (NFL), (collectively, "the Major U.S. Professional Sports Leagues" or "the Leagues").  Since Panini entered the business in 2009, its superior innovation and competitive success have made it a market leader—besting established firms like Topps and Upper Deck.  Panini has significantly expanded the business of producing and selling new sports trading cards for all involved, as reflected in its reliably increasing revenues year-over-year—at times spectacularly so.  Panini currently holds an exclusive license with the NBA through September 2025, a license with the NBA Players Association through September 2025, and exclusive licenses with the NFL and the NFL Players Association through March and February 2026.

2.    Enter Fanatics, which until very recently had zero experience in the trading-card industry.  Fanatics is deploying a strategy of calculated, intentional, anticompetitive conduct ("Anticompetitive Conduct") to monopolize the markets for Major U.S. Professional Sports Leagues trading

cards that, as described more fully below, includes the production and sale of trading cards.

3.     Fanatics began its Anticompetitive Conduct by secretly securing long-term, exclusive licensing deals with the NBA and MLB, along with each of their respective players associations, the NFL Players Association, and later the NFL itself.  Although the exact terms have not been made public, the NBA and NBA Players Association deals are for at least ten years and the NFL, NFL Players Association, MLB, and MLB Players Association are for twenty years. So Fanatics has locked up all three major sports for the next decade and two of them for the next two decades.

4.     Shortly after announcing the exclusive agreements, Fanatics acquired another trading-card company, Topps, which immediately gave it active licenses with MLB (exclusive), MLB Players Association (nonexclusive), and Major League Soccer (MLS) (exclusive).

5.     Fanatics continued its Anticompetitive Conduct by raiding Panini's employees.  And it signed star, rookie NFL and NBA players to exclusive deals for their original, handwritten autographs, denying Panini access to them during the coming years when Panini still holds exclusive rights at least to those Leagues' marks.  Fanatics acquired control of and proceeded to interfere with Panini's source of specialized manufacturing for over ninety percent of Panini's requirements.  It disseminated false, derogatory statements

about Panini's current operating capabilities to third parties and in so doing tortiously interfered with Panini's contracts with its employees, current and prospective business partners, and its critical manufacturer.  And it cut off Panini's main supply of player jerseys for use in trading cards.

6.     Fanatics has done all this Anticompetitive Conduct to monopolize the markets for Major U.S. Professional Sports Leagues trading cards (and others) even before its exclusives begin.  In other words, unlike Panini—which gradually grew in the United States sports-trading-card industry through innovation and competitive success after starting with shorter term, often nonexclusive deals—Fanatics is preemptively eliminating all competition, before showing competitive superiority or any ability to benefit consumers. And by locking up player trading cards for all three Major U.S. Professional Sports Leagues for the next decade and two of them for the next two decades, Fanatics is foreclosing any meaningful competition for the foreseeable future.

7.     In addition to engaging in Anticompetitive Conduct, Fanatics has tortiously interfered with Panini's existing contracts and future business and engaged in unfair competition and commercial disparagement through disseminating false, derogatory statements about Panini.

8.     In short, Fanatics seeks to cripple Panini both for the short term— the remaining years on Panini's current exclusive license agreements—and the long term.  It has done so through anticompetitive and tortious conduct for

3

which Panini seeks to hold Fanatics accountable.  Without redress, consumers will suffer, prices will rise, quality will fall, and innovation will be stifled.

## II.  Jurisdiction and Venue

9.     This action arises under Sections 1 and 2 of the Sherman Antitrust Act, which is codified at 15 U.S.C. §§ 1–2, as well as § 7 of the Clayton Act, which is codified at 15 U.S.C. § 18.  Panini seeks damages under § 4 of the Clayton Act, which is codified at 15 U.S.C. § 15, and injunctive relief under § 16 of the Clayton Act, codified at 15 U.S.C. § 26.

10.    This Court has subject matter jurisdiction under 15 U.S.C. §§ 15 and 26; 28 U.S.C. § 1331; and 28 U.S.C. § 1337(a).

11.    This Court has supplemental jurisdiction over Panini's State-law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts alleged in this Complaint and are so related to Panini's federal-law claims that they form part of the same case or controversy.

12.    This Court has personal jurisdiction over each Defendant named here under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because, among other things, each (a) resides in this District, (b) transacts business in this District, (c) directly or indirectly sells and delivers commerce in this District, and (d) has substantial aggregate contacts with this District.

13.    This Court also has personal jurisdiction over each Defendant named here under Florida Statute § 48.193, as each operated, conducted,

engaged in, and carried on a business venture in this State; committed tortious acts within this State; caused harm in this State; and is engaged in substantial and not isolated activity within this State.

14.     Venue lies in this District pursuant to 15 U.S.C. §§ 15(a) and 22 along with 28 U.S.C. § 1391 because each Defendant has its principal place of business in this District and thus resides in this District, resides in the State in which this District is located, and is subject to personal jurisdiction in this District.   Venue is also proper in this District because each Defendant transacted business, was found, or had agents in this District, and a substantial part of the events giving rise to Panini's claims occurred and a substantial portion of the affected interstate trade and commerce has been carried out in this District.  Fanatics' website indicates that it has corporate offices in Tampa, Lake Mary, and Jacksonville in this District, and identifies Tampa as its brand headquarters, as well as a location for manufacturing and distribution.

15.     Fanatics' Anticompetitive Conduct, as described herein, involved interstate trade or commerce and/or was within the flow of, was intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States interstate commerce, as well as on commerce and consumers in States including Florida.

16.    If Fanatics' Anticompetitive Conduct is allowed to continue, Fanatics will obtain unlawful, monopolistic control over the markets for new Major U.S. Professional Sports trading cards, as detailed below, affecting the prices in those markets, and affecting customers throughout the United States.

17.    Fanatics also uses instrumentalities of interstate commerce to produce, sell, market, and ship its trading cards.

## III.   The Parties

### A. Plaintiff

18.    Panini America, Inc., ("Panini") is a subsidiary of the Panini Group, a global, trading-card company with its principal place of business in Modena, Italy.

19.    Panini produces and sells sports trading cards.  It is a Delaware corporation with its principal place of business in Irving, Texas.  Panini conducts business throughout the United States, including the State of Florida.

### B. Defendants

20.    Fanatics, Inc., is a Delaware corporation with its principal place of business in this District.

21.    Fanatics, LLC, is a sole-member LLC organized in Delaware with its principal place of business in this District.

6

22.  Fanatics Holdings, Inc., is a Delaware corporation with its principal place of business in this District.

23.  Fanatics Collectibles Intermediate Holdco, Inc., d/b/a Fanatics Trading Cards, is a subsidiary of Fanatics Holdings, Inc., and a Delaware corporation with its principal place of business in this District.

24.  Fanatics SPV, LLC, is a Delaware limited liability company with its principal place of business in this District.

25.  Panini refers to Defendants collectively as "Fanatics" because they all operate under the name "Fanatics" and hold themselves out as one unified entity: Fanatics.  The Complaint's allegations are to be construed against all Defendants individually and collectively.

26.  Fanatics promotes itself as an online manufacturer and retailer of licensed sportswear, sports collectibles, sports merchandise, and—now—sports trading cards.  Fanatics conducts business throughout the United States, including in the State of Florida, where it operates at least four offices.

27.  Fanatics is an actual or potential competitor of Panini.

## IV.   Market Definition

### A. Overview of Relevant Product Markets

28.   The products at issue here are colloquially described as sports trading cards, and the production and sale of these cards.

29.   Sports trading cards generally have two key ingredients:  (1) a license from a sports league for that league's marks—such as team logos and color combinations—and (2) a license from that league's players association for the use of player names, images, likenesses, signatures, and the like ("Major League Licenses").   With those two ingredients—and only those two ingredients—a licensee can proceed with the production and sale of a fully licensed, trading-card set complete with league logo, team uniform, and player image (and perhaps much more).

30.   Because, among other things, these two ingredients from both the league and players association are necessary for the production and sale of a fully licensed trading-card set, neither an individual league nor an individual players association has or could itself produce and sell fully licensed trading cards.

31.   Sports trading cards are differentiated by sport, league, and product quality.  The relevant markets for these products are characterized by strong consumer preferences for particular sports, leagues, teams, and players.  Differences in card preferences and in predictions of future value enable gains

from trade among consumers.  Moreover, the production and sale of different types of trading cards satisfies the demands of a wide range of consumers—from young casual traders to older sports enthusiasts to high-end collectors and investors.

32.    The initial relevant markets are the markets for each of **NBA player trading cards**, **NFL player trading cards**, and **MLB player trading cards**.  The NBA, NFL, and MLB consist of thirty, thirty-two, and thirty teams, respectively.  Each of the teams has ceded control over their trademarks to their respective Leagues for purposes of the production and sale of trading cards here.

33.    As elaborated below, consumers do not view trading cards for players from one League as interchangeable with cards for players from another League.  On the supply side, licenses from one League or League Players Association are not interchangeable with those of another.

34.    The individual trading card markets above can also be viewed as relevant "submarkets" within the larger market for all **Major U.S. Professional Sports Leagues trading cards**.  The size and importance of the markets for the other U.S. major-league sports—the National Hockey League (NHL) and MLS—pale in comparison to the "big three" Major U.S. Professional Sports Leagues and do not materially alter the antitrust analysis.  That is, even if NHL and MLS trading cards were considered in the relevant

market, the market-definition, market-power, and competitive-effects allegations here would remain accurate.

35.   As a result of strong consumer preferences and high degree of product differentiation, the relevant antitrust product markets are divided by producers, consumers, and distributors into markets for **Mass Market** trading cards and **Premium** trading cards.

36.   Significant price, distribution, quality, design, and marketing differences distinguish Mass Market from Premium cards.  Mass Market cards are sold at a low price—such as $5–15 per "packet" of eight-to-ten cards—through mainstream channels such as Walmart, Target, pharmacy chains, and other retailers at which casual sports fans (or their parents) often shop.  Premium cards sell for hundreds or even thousands of dollars per packet at specialist retailers known as card shops.

37.     Premium cards are premium products with high-end printed features and one-of-a-kind differentiators such as hand-signed autographs or pieces of jerseys integrated into the cards—or both.  For example:





38.     Some Mass Market card lines include cards with signatures or other special features, but the frequency is far lower.

39.     Mass Market cards are targeted to casual collectors, such as youngsters, and enthusiasts.  Mass Market cards are the modern successor to

the wax-paper-wrapped, bubble-gum packets of decades past.  Mass Market cards are likely to be found trading and circulating in the schoolyard.

40.   For consumers, there is limited product interchangeability between Mass Market and Premium cards.  Large price differences, for example, distinguish the two different types of cards, and quality differences make the two types of cards suitable for different collectors with very different aims.  There is also limited interchangeability between either Mass Market cards or Premium cards and sports collectibles such as jerseys and caps. Investing in art and non-card collectibles is even less a substitute for either Mass Market or Premium cards.

41.   To recap, the products at issue here—sports trading cards— implicate eight relevant markets and submarkets: Mass Market and Premium cards for each of **(1)** Major U.S. Professional Sports Leagues trading cards; **(2)** MLB player trading cards; **(3)** NBA player trading cards; and **(4)** NFL player trading cards (collectively, the "Relevant Markets").  Each of these markets is elaborated on below.

42.   Each Relevant Market also may contain further submarkets with competitive significance for the actions here.  All the inputs described herein— particularly Major League Licenses—are needed to produce and sell Major U.S. Professional Sports Leagues trading cards to those markets.

## B. The Markets for Each of the Major U.S. Professional Sports Leagues Trading Cards—MLB Player Trading Cards, NBA Player Trading Cards, and NFL Player Trading Cards

43.     Many consumers prefer one of the Major U.S. Professional Sports Leagues.  For example, many consumers do not view MLB player trading cards as interchangeable with NFL player trading cards.  Even fans of both sports do not regard their cards for one sport as reasonably interchangeable with cards for the other sport.  Each of the Major U.S. Professional Sports Leagues is well-established, unique, and has its own devoted followers.  Such features severely limit the interchangeability of cards in satisfying consumer demand.

44.     Some consumers collect cards featuring their favorite players or teams.  Others like to collect sets of all teams from a League or obtain rare and valuable cards featuring a League's star players.  Either way, cards for one League do not satisfy consumer demand for another.  So there are distinct antitrust markets.

45.     The relevant product market(s) are limited to newly issued trading cards created by card producers and sellers like Panini.  In industry terms, this is the "primary" market, and it is distinct from the re-sale—or "secondary"—market.

46.     The league-, team-, and player-specific loyalty of sports enthusiasts dictates that only a Major League License will suffice to compete in the Relevant Markets.  There is simply no substitute for a Major League

License to reach consumers devoted to their respective sport, team, or favorite players.

47.     The Relevant Markets also have high barriers to entry, including because of the need for licenses, the limits on individual teams granting their own licenses, the existence of exclusive licenses, the duration of licenses, specialized high-tech manufacturing requirements, and the need for skilled workers such as card designers, program designers, product developers, athlete acquisition managers, and specialist print managers.

48.     In the recent past in which most licenses have been exclusive, a new entrant typically would need to wait for one of the Leagues' contracts to near termination, then bid for the exclusive or nonexclusive license from that League.  By having the ability to produce and selling trading cards for players of at least one Major U.S. Professional Sports League, a firm can maintain a market presence that allows it to compete in the future for the production and selling of trading cards for players of other Major U.S. Professional Sports Leagues.  But any firm that fails to win the rights to produce and sell trading cards for players of at least one of the Leagues is eliminated as a competitor.

49.     These barriers also inhibit new entry from firms outside the markets for new Major U.S. Professional Sports Leagues trading cards.

### C. The Relevant Geographic Markets

50.    The appropriate geographic market is the United States.

51.    Consumers generally purchase new Major U.S. Professional Sports Leagues trading cards within their own country.  Moreover, the interest in sports is generally country-specific, with the U.S. market focused on the Major U.S. Professional Sports Leagues, while foreign markets may favor other sports, such as cricket, rugby, soccer, or hockey.  Thus, for the market for Major U.S. Professional Sports Leagues trading cards and the individual League submarkets, the relevant geographical area for this case is the United States.

52.    Consumer preferences and demand for trading cards of particular Leagues also vary by country.  In the United States, cards for NFL players, NBA players, and MLB players constitute the vast majority of new trading-card sales.

## V.    Panini and Competition in and for the Relevant Markets

### A. Panini's Success Growing the Relevant Markets

53.    For over sixty years, Panini Group has produced and sold trading cards outside the United States.  Panini Group entered the United States trading-card business in 2009 through its subsidiary, Panini America, Inc. ("Panini").

54.    In January 2009, the NBA announced a four-year exclusive deal with Panini to produce and sell NBA player trading cards.  At the time, the

15

NBA controlled both the League and player licensing rights, so that deal covered the NBA League itself and its players association.  Later that year, after securing the NBA deal, Panini bought the assets of Donruss Playoff, L.P., an American trading-card company that at the time held nonexclusive licenses with the NFL and NFL Players Association.  So by the end of 2009, Panini was producing and selling NBA player trading cards (exclusively) and NFL player trading cards (nonexclusively).  And in 2011, Panini secured a three-year, nonexclusive license with the MLB Players Association.

55.    Through superior innovation and competitive success, Panini achieved great results for the Leagues, players associations, and consumers in producing and selling NBA player, NFL player, and MLB player trading cards in the years that followed—reliably increasing revenues year-over-year through innovative designs, marketing, and distribution.

### B. Panini's Production and Sale Processes

56.    Panini's success is due in part to unique innovations it has brought to the trading-card industry that have benefited consumers along with the Leagues and players associations that Panini has served.

57.    Each year, Panini releases up to 100 or more unique card collections featuring the previously mentioned licensors.  Each collection, in turn, includes many individual brands, sets, and sub-sets.

58.    Panini produces trading cards in boxes and packs of trading cards, and then sells the cards to authorized distributors (including big-box retailers and specialist-retailer shops) and directly to consumers on its website—which forms the primary trading-card market.  Panini does so at various prices determined by its pricing models consistent with the product's specifications.

59.    Some collections will include "Insert Cards," which are specialty cards that are rarer than common "base" cards.  Insert Cards make up a very small percentage of Panini's manufactured trading cards, but this scarcity gives them significant consumer appeal and value.  Some of these Insert Cards are elaborate and include the featured player's autograph or memorabilia (or both), such as a piece of clothing or other gear used by that player.

60.    Panini's trading-card collections are typically issued annually, to coincide with a particular season for a sport.  Significant work goes into designing a card collection before its release date.

61.    Panini has invested heavily in the establishment of brands and has developed a wide range of strategies, software, and formulas for the production and sale of its sports trading cards for the Relevant Markets.  It also has trained and developed employees with distinctive, highly specialized skills and knowledge of Panini's methods.

### C. Competition in and for the Relevant Markets

62.     Before Fanatics' actions here, three major companies competed in and for the Relevant Markets:  Topps, Upper Deck, and Panini.

63.     Topps held an exclusive license with MLB, as well as a nonexclusive license with the MLB Players Association.  Topps also had an exclusive agreement with MLS.

64.     Panini holds exclusive licenses with the NFL (through March 2026), the NFL Players Association (through February 2026), and the NBA (through September 2025).  Panini also holds a license with the NBA Players Association through September 2025.  Panini previously held a nonexclusive license with the MLB Players Association that expired in December 2022.

65.     Because of Fanatics' Anticompetitive Conduct, the Major U.S. Professional Sports Leagues trading cards market will be entirely controlled by a single firm for decades.  Or put differently, Fanatics has foreclosed—for decades—all competition for player trading cards for the ninety-two teams that compose the NBA, NFL, and MLB.

66.     Fanatics has created an entirely new monopoly spanning multiple leagues and multiple players associations.  By doing so, Fanatics has erected insurmountable barriers to entry for decades.  No individual league or players association could achieve anything like the monopoly that Fanatics has achieved through its Anticompetitive Conduct.

18

## VI.   Fanatics Executes its Anticompetitive Conduct

### A. Fanatics secures ten- and twenty-year exclusive deals.

67.     Fanatics had no experience in the trading-card industry as of 2021. It lacked knowledge and expertise.

68.     Notwithstanding this lack of knowledge and expertise, in August 2021, Fanatics simultaneously announced the acquisition of the leading professional sports licenses in North America:  MLB, the MLB Players Association, the NBA, the NBA Players Association, and the NFL Players Association—each expiring in several years.  Later, Fanatics acquired the NFL exclusive license soon after, thus securing all six of the Major League Licenses for Major U.S. Professional Sports Leagues trading cards.   When it acquired Topps, it also obtained an exclusive license with MLS.

69.     The exclusive licenses that Fanatics acquired locked competitors out of the market for decades.  Four of the licenses (the licenses that Fanatics acquired from the NFL, NFL Players Association, MLB, and MLB Players Association) are for twenty years.  Fanatics' licenses with the NBA and NBA Players Association, the exact terms of which have not been made public, are for at least ten years.   The duration of Fanatics' exclusive-dealing arrangements are well beyond anything that is necessary for any legitimate economic or other purpose.   Twenty years by a wide margin is an unprecedented exclusive-dealing duration in the trading-card business.

70.     Panini was not given an opportunity to bid or otherwise compete for the licenses Fanatics acquired.   Panini only learned about Fanatics' exclusive agreements after they were consummated, through reading about them in the media.  By combining long-term exclusive licenses for every Major U.S. Professional Sports League and their respective players associations, Fanatics positioned itself to drive Panini and other potential competitors out of the market, and erected barriers to entry blocking their return.

71.     Nor was the new, untested Fanatics given its long-term exclusives after proving it could perform through a short-term trial contract consistent with past industry practice.   Yet Fanatics' exclusive agreements foreclose competition entirely in the markets for new MLB player trading cards, new NBA player trading cards, and new NFL player trading cards.   Fanatics' exclusive agreements foreclose one-hundred percent of the market for Major U.S. Professional Sports Leagues trading cards.   Thus, Fanatics sought to eliminate Panini and others from competing in the production and sale of trading cards by completely blocking an essential input and not by competition on the merits.

72.   The unprecedented duration of Fanatics' exclusive-dealing agreements causes substantial harm to competition in these markets including because competition cannot occur until the end of the exclusive contract approaches—competition "for" the market; that is, competition to replace the

prior holder of the exclusive contract.  Competition for Major League Licenses typically occurred every handful of years, because the agreements between the Leagues and Topps, Panini, and Upper Deck had shorter terms and staggered expiration dates.  Now, because of the length of Fanatics' exclusive-dealing arrangements, any competition "for the market" cannot take place for decades.

73.    Securing these exclusive deals was critical to Fanatics' overall plan.  As intended by Fanatics, their practical, combined effect was to facilitate Fanatics' subsequent anticompetitive attacks on Panini and other market participants and ensure that Fanatics could maintain the monopolistic fruits of its Anticompetitive Conduct for decades.  Fanatics has sought to use the collective force of these exclusive agreements to—even in the short term— coerce anticompetitive, exclusionary deals with Panini's employees, a critical manufacturing supplier of trading cards to Panini, and star professional basketball and football players—all well before Panini's existing licenses are due to expire.

**B. Fanatics acquires one of the last trading-card companies.**

74.    After securing its exclusive deals, on January 4, 2022, Fanatics announced that it had persuaded Topps to sell itself to Fanatics for a price reported to be in the range of $500 million.

75.    Because Fanatics had acquired twenty-year exclusive deals with Topps's primary business partners—MLB and the MLB Players Association— the reality was that Topps had almost no choice but to sell.

76.    This practical effect of its exclusive deals was what Fanatics intended all along, which was that not only would Topps give in, but Panini would also fall like a domino in the wake of Fanatics' Anticompetitive Conduct.

**C. Fanatics acquires control over Panini's critical specialty manufacturer and uses its control to undermine Panini's existing business.**

77.    Having persuaded Topps to sell and thereby further strengthened its leverage, in March 2022, Fanatics acquired through two transactions a controlling stake in GC Packaging, LLC (GCP)—the critical, high-tech, custom manufacturer of trading cards for Panini.  This acquisition—a direct violation of GCP's contractual obligations to Panini—was taken to undermine Panini's ability to perform even in the short run under Panini's existing licenses thereby hoping to force Panini into a sale.

78.    Of at most three quality manufacturing providers in the United States, GCP is ***the only*** manufacturing provider able to meet Panini's

technological quality and capacity requirements.  GCP is therefore an essential input for Panini's entire business.

79.     The group of viable card manufacturers consists of only a few high-tech, specialty firms that offer the unique set of technological services necessary to produce cards that are demanded by consumers in these markets. A conventional or even a specialty print shop is not a supply-side possibility. This is because manufacturing trading cards requires print technology that is unique to the production of many types of trading cards that are important to the market and central to Panini's business.

80.     The trading card manufacturing process is highly complex.  It requires more exacting standards than is typical of the printing industry for things like print registration, color variance, foil stamping, guillotine cutting, slitting borders, lamination, wrapping, and packaging—all while navigating a variety of underlaying substrates of varying degrees of thickness (such as plastic, paper, aluminum, and even gold) that must be paired perfectly with the correct, custom-mixed, spot color.  Adding materials such as jerseys, sneakers, and other memorabilia like Panini does increases the technological complexity dramatically.

81.     A competitive manufacturing provider must be able to perform all the above with minimal mistakes—just one error can require starting from scratch, imposing massive costs on the provider.

82.   A competitive manufacturing provider must also have a proven record of tight security because the number and ratio of special and rare Insert Cards must be carefully controlled to ensure appropriate distribution.

83.   A competitive manufacturer also must produce cards of the highest quality according to exacting standards.  This is because certain high-end card collectors demand pristine cards.  "Mint" condition cards are highly valued, and a manufacturing provider that cannot produce and package cards so that they reach their ultimate consumer in perfect condition will undermine the product and brand.

84.   A competitive manufacturer also must have a flexible array of systems because some special cards use unique materials—such as unique or uniquely finished card stock, acetate or acrylic cards, or cards that incorporate pieces of jerseys or other memorabilia.

85.   These special cards must likewise be produced according to precise standards lest the product's value be destroyed.  And they must be produced on time—each season of each sport brings new designs, players, logos, rosters, and other changes.

86.   Because of the specialized complexity involved with manufacturing trading cards, there are at most only a few manufacturers of quality output in the United States.  But only GCP has the necessary

equipment, technology, and capacity to manufacture trading cards according to the exacting standards Panini requires.

87. GCP has a contract with Panini under which GCP produces most of Panini's cards.  In fact, GCP manufactures over ninety percent of Panini's trading-card requirements, and the overwhelming amount of GCP's production has been for Panini.

88. Because of GCP's critical role in Panini's operations and the centrality of Panini's business to GCP, Panini's contract with GCP prohibits GCP from undergoing a change in control without Panini's consent.  Fanatics' acquisition of control of GCP—without notice to, or consent by, Panini—is a direct violation of this contractual restriction.

89. Panini has been by far GCP's most important purchaser of trading-card manufacturing services, with fifteen of its eighteen machine lines being devoted to Panini's business at the time Fanatics acquired control.   Over the last fourteen years, Panini has collaborated with GCP on research and development to allow GCP to develop substantial know-how in meeting Panini's requirements—from the most basic cards to those most sophisticated in their design, including implanting within the trading card bits of uniform, shoes, and other memorabilia.

90.    Panini's close collaboration with GCP is what caused GCP to develop its technological and capacity capabilities, which are unmatched by any other manufacturing provider.

91.    Because of its contractual role as Panini's specialty manufacturer and the firms' close working relationship over many years, GCP also has access to a substantial amount of Panini trade secrets, such as information about its production runs, product mixes, and form breaks (detailed product specifications that are the "secret recipe" for producing a run of cards).

92.    Fanatics targeted and acquired control of GCP to weaken Panini before causing its exit.  Fanatics has no need for owning or controlling GCP's manufacturing services to meet its current obligations under its licenses with MLB and the MLB Players Association.

93.    Because Fanatics has control over GCP, Panini is now beholden to Fanatics for its lifeblood—the production of nearly all its trading cards.

94.    Fanatics has exercised this control over GCP to interfere with and restrict Panini's supply of trading cards, notwithstanding Panini's contractual relationship with GCP.  Before the acquisition by Fanatics, GCP had eighteen machines capable of producing trading cards to Panini's specifications, and GCP dedicated fifteen of those machines to Panini because Panini's demand constituted the vast majority of GCP's business.  Following the acquisition by Fanatics, the number of machines working on Panini projects was reduced by

around half even though there was no new GCP business that they were needed to serve.

95.     Manufacturing capacity is reserved in advance to ensure adequate, specially trained staffing, resources, and quality control.  Panini had thus scheduled with GCP in advance to produce twenty-two releases for November 2022 and eighteen releases for December 2022.  With only ten days' notice, Panini was told that GCP had shifted its priorities, resulting in the releases scheduled for November and December being reduced to merely six-to-eight releases for each month.  GCP would have had to begin implementing any such shift (if it were indeed real rather than pretext) well before it provided the ten-day notice to Panini due to GCP's standard thirty-four-week production planning timeline.

96.     Through acquiring control of GCP, Fanatics now controls the critical means of manufacturing Panini's trading cards and has been exercising that control to harm Panini and other competitors.

### D. Fanatics raids Panini's employees to undermine Panini's ability to compete.

97.    By Fall 2022, Fanatics implemented the next step in its Anticompetitive Conduct to monopolize the Relevant Markets and force Panini to sell.

98.    In September 2022, Fanatics rented out a new office in Dallas, Texas, for its collectibles business—choosing to locate it approximately one thousand miles from its Florida headquarters but mere miles away from Panini's headquarters.

99.    As part of its Anticompetitive Conduct to monopolize the Relevant Markets, Fanatics attempted to deny Panini another critical input for its business operations—its key employees.  To do so, Fanatics launched a raid of Panini employees and tortiously interfered with those employees' contracts with Panini.

100.    On or about April 4, 2023, Fanatics—which knew about the contracts Panini had with its employees—began trying to hire and hiring significant numbers of key Panini employees.  In fact, earlier, Fanatics even tried to poach Panini America's Chief Executive Officer, Mark Warsop.

101.    Fanatics managed to use unlawful means to lure, as of the date of this Complaint, thirty-six employees to leave Panini and join Fanatics.  These employees composed Panini's entire acquisition and product-development

28

teams going down at least one or two—and in most instances, three or four—lines of reporting to Panini's CEO.   Fanatics raided them to harm Panini and did so with a combination of threats and enticements.

102.   For threats, Fanatics induced some employees to come to Fanatics by threatening them with not working in the industry ever again once Panini's licenses expired unless those employees committed immediately to join Fanatics.   That Fanatics, in a few years, would hold long-term exclusive licenses to ***all*** Major U.S. Professional Sports Leagues (and their players associations) provided credibility to these threats.   And in some cases Fanatics went even further, telling Panini's employees that it would soon take over Panini's business *before* Panini's licenses expired and thus Panini—and with it these employees' jobs—would no longer exist.   So if these employees wished to continue in the industry, Fanatics' story went, they needed to join Fanatics immediately.

103.   For enticements, Fanatics induced some employees to quit their jobs at Panini and join Fanatics by offering compensation packages at levels that make economic sense only as part of a plan to force Panini out of the business of producing and selling NFL player trading cards and NBA player trading cards during the remaining term of Panini's licenses.

104.   The raided employees were experts at producing NFL player trading cards, NBA player trading cards, and MLB player trading cards.   But

Fanatics cannot produce the NBA player trading cards and NFL player trading cards for which Panini is exclusively licensed until those licenses expire in 2025 and 2026 and Fanatics' exclusives with the NBA and NFL begin. Moreover, the Topps acquisition already gave Fanatics the employees needed to operate the MLB, MLB Players Association, and MLS licenses Fanatics acquired in that deal.

105.  The raided employees, then, are, to a large extent, surplus to Fanatics' staffing needs at least until 2025 or 2026—unless Fanatics manages to shut down Panini's NFL and NBA operations early.

106.  Fanatics' raiding these employees years in advance tried to harm Panini's current ability to perform under its existing licenses and shore up Fanatics' monopoly power by putting Panini out of business.

### E. Fanatics pays star, rookie players to not deal with Panini.

107.  By Spring 2023, in a similar demonstration of exclusionary intent and to increase the coercive pressure on Panini, Fanatics began a targeted effort to execute exclusive deals with star, rookie players depriving Panini of the ability to include those players' original, handwritten autographs with its trading cards during the remaining years of Panini's existing licenses. Fanatics is effectively paying these players to at least prevent them from dealing with Panini.

108.   Fanatics has signed several NFL and NBA rookie players to extraordinarily lucrative deals for their original, handwritten autographs that, importantly, include exclusivity provisions.  In essence, Fanatics is paying these players large sums to keep their original, handwritten autographs *off* the most important trading cards for the critical, early years of their careers during which they otherwise are trying to enhance their reputations.

109.   Panini's agreements with the NFL and NBA and their respective players associations do not foreclose players individually signing exclusive deals for use of their original, handwritten autographs.  But Fanatics' doing so deprives consumers for years of the full range of trading cards that they would otherwise be able to enjoy from Panini and furthers Fanatics' Anticompetitive Conduct.

110.   Panini holds exclusive licenses with the NBA and NFL until 2025 and 2026 to use those Leagues' marks, such as team uniforms, logos, and color combinations.  Fanatics cannot sell star, rookie players' original, handwritten autographs on its own trading cards with NBA and NFL marks until 2025 and 2026.  The most it can do is create what the trading-card industry pejoratively calls "pajama cards" that brush out all League marks, generally resulting in low-quality cards depicting players seemingly in pajamas.

111.   Fanatics' signing these players to exclusives over the remaining terms of Panini's licenses with the NBA and NFL harms Panini and reduces

31

consumer welfare by depriving Panini of the ability to provide consumers with superior products—trading cards with original, handwritten autographs—that they otherwise could buy.

### F. Fanatics disparages Panini to third parties.

112.   At about the same time that Fanatics began signing star, rookie players, it also disseminated false and derogatory statements about Panini to three sets of third parties that are central to Panini's operations under its existing licenses: (1) players, player agents, and player representatives; (2) players associations; and (3) Panini's current and now-former employees.   To harm Panini's business, Fanatics has told these third parties that Panini *is* incapable of performing for them, will be out of business soon, and lacks the money to pay them.

113.   These statements are false.   Panini is well-capitalized with an experienced executive-management team, and it remains the only exclusive, licensed, trading-card partner of the NBA and NFL.

114.   Fanatics disseminated false, derogatory statements about Panini to players, player agents, and player representatives to induce players to refrain from doing business with Panini and to instead sign exclusive-licensing agreements with Fanatics, even to the extent of forfeiting their ability to deal with Panini while its existing licenses remained in force.

115.   Fanatics also disseminated false, derogatory statements about Panini to players associations to induce the associations to breach their contracts with Panini.

116.   Fanatics also disseminated false, derogatory statements about Panini to entice employees to leave Panini and join Fanatics.  For example, as detailed above, Fanatics told employees that Panini *is* incapable of performing for them, will be out of business soon, and lacks the money to pay them. Fanatics made these statements to harm Panini's business reputation and raid its employees.

117.   Fanatics managed to lure away thirty-six key employees from Panini by leveraging these false and disparaging statements.

118.   These statements have harmed Panini's business reputation and disparaged Panini's business.

### G. Fanatics pledges never to stop coercing Panini and cuts off Panini's supply of jerseys.

119.   One of many innovative elements that Panini offers to trading-card consumers is the inclusion in important lines of Premium cards of a piece of a player's jersey integrated into that player's trading card.  Critical to that offering is obtaining the jerseys themselves.  For years, Panini obtained the bulk of its supply of official player jerseys from Fanatics—but no more.

120.   Fanatics' CEO, Michael Rubin, approached Panini in May 2023 to threaten that Fanatics would no longer supply Panini with any jerseys for Panini to offer to consumers as elements of its trading cards.  Rubin added that Fanatics would not stop its pressure campaign against Panini and would continue to sign exclusive deals with players that Panini could otherwise use to offer fully licensed trading cards to consumers.

*     *     *

121.   Fanatics' Anticompetitive Conduct has consisted of at least seven elements that harm competition, each of which involved clear, anticompetitive intent: **(1)** Fanatics has simultaneously locked up the only sources of an input necessary in the production and sale of Major U.S. Professional Sports Leagues trading cards—the League and player association licenses to produce such cards; **(2)** Fanatics has acquired Topps, one of the last trading-card companies besides Panini; **(3)** Fanatics—by acquiring control of GCP, causing breach of GCP's contracts, and taking other conduct aimed at harming Panini's ability to produce Major U.S. Professional Sports Leagues trading cards—has restricted Panini's access to the specialized manufacturer for over ninety percent of Panini's trading cards; **(4)** Fanatics has raided Panini's employees, not to provide short-term benefits to Fanatics, but in aid of Fanatics' goal to deprive Panini of those employees' services, thereby seeking to destroy Panini and help Fanatics monopolize the Relevant Markets; **(5)** Fanatics has signed

34

star, rookie players to exclusive deals to deprive Panini of using their original, handwritten autographs to create a complete, fully licensed trading card; **(6)** Fanatics has disseminated derogatory statements about Panini to central third parties; and **(7)** Fanatics has cut off Panini's supply of jerseys and threatened further, coercive, anticompetitive conduct.

122. In all, Fanatics' Anticompetitive Conduct has left no stone unturned.  It has anticompetitively attacked Panini on every front, cut off all its key inputs, and more broadly undermined Panini's every act in competing in and for the Relevant Markets.

123. Each of these acts represents anticompetitive, exclusionary conduct that harms competition and consumers and for which no procompetitive justification exists and together they constitute monopolistic Anticompetitive Conduct.

## VII.  Fanatics' Market Power and Monopoly Power

124. Fanatics' ten-to-twenty-year exclusive agreements foreclose the access of competitors to the critical inputs for each of the three MLB player trading card, NBA player trading card, and NFL player trading card markets as well as the Major U.S. Professional Sports Leagues trading cards market (and markets for Mass Market and Premium cards) for an unprecedented period and consolidates the Major U.S. Professional Sports Leagues trading cards market into the hands of a single firm for the first time ever.  In so doing

35

and together with the rest of its Anticompetitive Conduct, Fanatics has restrained competition in and has monopolized, or is attempting to monopolize, the Major U.S. Professional Sports Leagues trading cards market for decades.

125. The Relevant Markets are characterized by high barriers to entry. It takes a great deal of brand investment, financial stability, and expertise to enter the market for Major U.S. Professional Sports Leagues trading cards or any of the other relevant markets. Only the Major U.S. Professional Sports Leagues offer the volume necessary to be a significant competitor. So, too, for financial stability and industry expertise.

126. Panini managed to gain a foothold in the market by securing a League license and acquiring one of the Major U.S. Professional Sports Leagues trading-card brands in 2009. Fanatics' soon-to-be total control of the market will render a similar foothold strategy impossible.

127. Fanatics has successfully and specifically intended to monopolize the overall market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium), which includes the production and sale of trading cards, and the individual submarkets for MLB player trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium).

128. If not enjoined, Fanatics' Anticompetitive Conduct will give it a complete and total monopoly of the individual submarkets for MLB player

36

trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium) and the market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium).  That monopolistic outcome is not just probable absent an antitrust remedy; it is locked down and assured by contract.  Through its exclusive deals and other Anticompetitive Conduct, Fanatics has successfully and specifically attempted to monopolize the overall market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium), and the individual submarkets for MLB player trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium).

129.   Fanatics' exclusive agreements, along with each constituent act of its Anticompetitive Conduct, harms competition in the short term and shows Fanatics' ability to exclude competition for decades.   Its Anticompetitive Conduct will eliminate its only remaining significant competitor in the United States:  Panini.  It also harms both the Mass Market and Premium trading-card consumer.   On the Mass Market side, one of the likely outcomes of Fanatics' Anticompetitive Conduct is a reduction in retail distribution channels—meaning the kid on the playground will have less options to buy trading cards after school in retail stores.  And on the Premium side, nothing supports believing that an unproven entity like Fanatics will be able to

replicate Panini's innovative use of proprietary methods of maintaining the value of Premium cards.

130. In fact, Fanatics is already beginning to abuse its market power. In July 2022, for example, Fanatics fired from its list of United States distributors the largest distributor of sports-trading cards, GTS Distribution.

131. And Fanatics has since threatened distributors to big-box retail stores with cutting them out of the process if they do not give Fanatics higher margins. Fanatics also has renegotiated terms directly with those same big-box retailers for them to carry more limited trading-card options—the ones belonging only to Fanatics (through Topps). In doing so, Fanatics intentionally reminded both the distributors to the big-box retailers and the big-box retailers themselves that, because of its total control over player trading cards for the Major U.S. Professional Sports Leagues, Fanatics will soon be the only way for them to receive necessary trading-card product.

132. Fanatics' actions relating to GTS, the distributors to big-box retailers, and the big-box retailers themselves harm consumers by, among other things, reducing consumer choice.

133. Fanatics also has engaged in similar, coercive conduct for Premium cards. It has pressured specialist-retailer shops not to sell trading cards on business-to-business, trading-card websites by threatening to never again supply those shops with cards if they do so. These threats have grown

so severe that the owner of a website was forced to place a banner at the top of the site, warning users of Fanatics' threats and offering to let users operate on the website anonymously to avoid Fanatics' wrath.

134.    Fanatics also has coerced a key participant in the trading-card industry: "box breakers."  Box breakers help bring new trading-card product to market, "breaking"—or opening—new trading-card boxes and packets by livestreaming over the internet.  Box breakers, though, need boxes of product to break.  Fanatics has made clear to them that their ability to secure those boxes will be challenging unless they immediately migrate to Fanatics' new box-breaking platform—Fanatics Live—on terms so draconian as to run their box-breaking business into the ground.  That result, of course, is the point.

135.    As these limited examples show, a monopolistic outcome here will harm the public, consumers, and competition by allowing Fanatics complete control to set and raise prices for MLB player trading cards, NBA player trading cards, and NFL player trading cards (both Mass Market and Premium) and the overall market for Major U.S. Professional Sports Leagues trading cards (both Mass Market and Premium), reduce incentives for development of higher-quality cards, and reduce consumer choice.

## Count One

## Attempted Monopolization

## Sherman Act Section 2

## 15 U.S.C. § 2

## (Against All Defendants)

136.   Panini realleges paragraphs 1 through 135.

137.   Fanatics, through its Anticompetitive Conduct and each of that Conduct's constituent acts, willfully has attempted, continues to attempt, and specifically intends to monopolize the market for each of the three MLB player, NBA player, and NFL player trading card markets and the overall market for Major U.S. Professional Sports Leagues trading cards—for both the Mass Market and Premium markets.   Fanatics has a dangerous probability of success in monopolizing each of these markets, each of which constitutes a substantial part of interstate commerce.   This probability is not due to superior products, business acumen, or historic accident, and instead results from its Anticompetitive Conduct and each of that Conduct's constituent acts, none of which constitute competition on the merits.

138.   Fanatics' Anticompetitive Conduct and each of that Conduct's constituent acts unreasonably restrain competition and erect insurmountable barriers to entry.   There are no procompetitive justifications to redeem them.

139.   Fanatics' Anticompetitive Conduct has affected a substantial portion of interstate commerce.

40

140.   Panini has suffered competitive injury and an injury of the type the antitrust laws were intended to prevent in the Relevant Markets and is an efficient and appropriate enforcer of the antitrust laws here.   Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

**Count Two**

**Monopolization**

**Sherman Act Section 2**

**15 U.S.C. § 2**

**(Against All Defendants)**

141.   Panini realleges paragraphs 1 through 135.

142.   Fanatics' Anticompetitive Conduct and each of that Conduct's constituent acts has willfully caused Fanatics to acquire and maintain monopolies of the overall market for Major U.S. Professional Sports Leagues trading cards, and each of the three MLB player, NBA player, and NFL player trading card markets (for both the Mass Market and Premium markets),  each of which constitutes a substantial part of interstate commerce.   These monopolies and their maintenance are not due to superior products, business acumen, or historic accident, and instead result from Fanatics' Anticompetitive Conduct and each of that Conduct's constituent acts.

143.   Fanatics' Anticompetitive Conduct and each of that Conduct's constituent acts unreasonably restrain competition and create insurmountable barriers to entry.  There are no procompetitive justifications to redeem them.

144.   Fanatics' Anticompetitive Conduct affects a substantial portion of interstate commerce.

145.   Panini has suffered, or will imminently suffer, competitive injury in the Relevant Markets and an injury of the type that the antitrust laws were intended to prevent and is an efficient and appropriate enforcer of the antitrust laws here.  Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

### Count Three
### Unreasonable Restraint of Trade
### Sherman Act Section 1
### 15 U.S.C. § 1
### (Against All Defendants)

146.   Panini realleges paragraphs 1 through 135.

147.   Fanatics executed at least ten-year exclusive deals with the NBA and NBA Players Association and twenty-year exclusive deals with the NFL, NFL Players Association, MLB, and MLB Players Association.

148.   Major League Licenses are critical inputs for the market for Major U.S. Professional Sports Leagues trading cards.  Thus, Fanatics' exclusive deals for Major League Licenses with the NFL, NBA, and MLB as well as their

respective players associations, along with the rest of its Anticompetitive Conduct and each of that Conduct's constituent acts, has foreclosed all or a substantial portion of the market for Major U.S. Professional Sports Leagues trading cards—both the Mass Market and Premium markets.

149.   Fanatics' exclusive deals for Major League Licenses with the NFL, NBA, and MLB as well as their respective players associations, along with the rest of its Anticompetitive Conduct and each of that Conduct's constituent acts, has foreclosed all or a substantial portion of the Relevant Markets.

150.   And at a minimum, Fanatics' exclusive deals for Major League Licenses with the NFL, NBA, and MLB as well as their respective players associations, along with the rest of its Anticompetitive Conduct and each of that Conduct's constituent acts, foreclose the entirety—that is, one-hundred percent—of each of the three MLB player, NBA player, and NFL player trading card markets for decades—both the Mass Market and Premium markets.

151.   Fanatics' exclusive deals for Major League Licenses with the NFL, NBA, and MLB as well as their respective players associations, along with the rest of its Anticompetitive Conduct and each of that Conduct's constituent acts, unreasonably restrain competition and create insurmountable barriers to entry.  There are no procompetitive justifications to redeem Fanatics' course of Anticompetitive Conduct.

152.   Fanatics' Anticompetitive Conduct has affected a substantial portion of interstate commerce.

153.   Panini has suffered competitive injury and an injury of the type the antitrust laws were intended to prevent in the Relevant Markets and is an efficient and appropriate enforcer of the antitrust laws here.  Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

**Count Four**

**Clayton Act, Section 7**

**15 U.S.C. § 18**

**(Against All Defendants)**

154.   Panini realleges paragraphs 1 through 135.

155.   The effect of Fanatics's acquisition of a controlling stake of GCP, as part of the Anticompetitive Conduct alleged herein, has been, and will continue to be, to substantially lessen competition or to tend to create a monopoly in the Relevant Markets in the United States in violation of Section 7 of the Clayton Act.

156.   Panini's Section 7 claim arises from Fanatics's acquisition of a controlling stake in GCP.  Fanatics is not a competitor of GCP; GCP is a manufacturer of inputs critical for producing Major U.S. Professional Sports Leagues trading cards.

157.    By foreclosing Panini's access to GCP, Fanatics's acquisition of control over GCP directly threatens, and has already been used to threaten, both Panini's competitive viability and competition more generally in the Relevant Markets, and there are no procompetitive justifications to redeem it.

158.    Fanatics' Anticompetitive Conduct has affected a substantial portion of interstate commerce.

159.    Panini has suffered competitive injury in the Relevant Markets and an injury of the type that the antitrust laws were intended to prevent and is an efficient and appropriate enforcer of the antitrust laws here.  Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

## **Count Five**

### **Clayton Act, Section 7**

### **15 U.S.C. § 18**

### **(Against All Defendants)**

160.    Panini realleges paragraphs 1 through 135.

161.    The effect of Fanatics' acquisition of Topps, as part of the Anticompetitive Conduct alleged herein, has been, and will continue to be, to substantially lessen competition or to tend to create a monopoly in the Relevant Markets in the United States in violation of Section 7 of the Clayton Act.

162. Fanatics' acquisition of Topps was vital to Fanatics' anticompetitive plan. Together with other Fanatics' Anticompetitive Conduct, it raised barriers to entry, eliminating forever one critical way that a new entrant might license as a foothold into the Relevant Markets.

163. Fanatics' Anticompetitive Conduct has affected a substantial portion of interstate commerce.

164. In the Relevant Markets, Panini has suffered competitive injury and an injury of the type that the antitrust laws were intended to prevent, and Panini is an efficient and appropriate enforcer of the antitrust laws here. Consumers will also suffer antitrust injury from decreased choice, increased prices, and loss of quality due to the absence of competition.

## Count Six

### Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")
### Florida Stat. § 501.204(1)
### (Against All Defendants)

165. Panini realleges paragraphs 1 through 135.

166. Fanatics' conduct described here was, among other things, an antitrust violation based on unlawful agreements in restraint of trade, monopolization or attempted monopolization, exclusive dealing, and acquiring control over assets of GCP and Topps in violation of the United States Code as set forth above. For these reasons, among others, Fanatics' conduct was

knowingly unfair and deceptive, injurious to the public, and an unfair method of competition in violation of FDUTPA.

167.   Fanatics' FDUTPA violation caused actual damage to Panini in the State of Florida and throughout the United States in the form of future lost sales and concomitantly reduced enterprise value.

168.   Fanatics' violations have and will continue to deprive consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and Fanatics' unlawful conduct will continue unless enjoined.

## Count Seven
### Tortious Interference with Contract
### (Against All Defendants)

169.   Panini realleges paragraphs 1 through 135.

170.   Panini has existing contracts with the NBA, NBA Players Association, NFL, NFL Players Association, GCP, and its own Panini employees.  Each of these contracts affords Panini existing or prospective legal rights.

171.   Fanatics wrongfully, and without justification or privilege, intentionally interfered with Panini's aforementioned existing contracts through anticompetitive, wrongful, and unjustifiable means of interference through its Anticompetitive Conduct, including by using its control over GCP

to disrupt Panini's production and sale of Major U.S. Professional Sports Leagues trading cards (both the Mass Market and Premium markets), inducing GCP to breach the change-of-control provision in its contract with Panini, inducing Panini employees to leave Panini for Fanatics, and engaging in the other Anticompetitive Conduct described herein that interfered with Panini's existing or prospective legal rights given it under its contracts with the NBA, NBA Players Association, NFL, and NFL Players Association.

172.   At the time of its actions, Fanatics had actual knowledge of the relevant contracts.

173.   Fanatics cannot justify its actions as legitimate competition.

174.   Fanatics' conduct has caused, and will cause, actual damage to Panini in the State of Florida and throughout the United States.

## Count Eight
### Tortious Interference with Prospective Business
### (Against All Defendants)

175.   Panini realleges paragraphs 1 through 135.

176.   Panini has existing or prospective business relations with the NBA, NBA Players Association, NFL, NFL Players Association, MLB, MLB Players Association, GCP, its own Panini employees, and star, rookie players.

177.   Fanatics wrongfully, and without justification or privilege, intentionally interfered with Panini's existing or prospective business

relations through anticompetitive, wrongful, and unjustifiable means of interference through its Anticompetitive Conduct, including by raiding Panini's employees and using its control over GCP to disrupt Panini's production and sale of Major U.S. Professional Sports Leagues trading cards, inducing GCP to breach the change-of-control provision in its contract with Panini, inducing Panini employees to leave Panini for Fanatics, inducing star, rookie players to not deal with Panini, and engaging in the other Anticompetitive Conduct described herein that interfered with Panini's existing or prospective business relations with the NBA, NBA Players Association, NFL, NFL Players Association, MLB, and MLB Players Association.

178.  At the time of its actions, Fanatics had actual knowledge of the relevant existing or prospective business relationships.

179.  Fanatics cannot justify its actions as legitimate competition.

180.  Fanatics conduct has caused, and will cause, actual damage to Panini in the State of Florida and throughout the United States.

## Count Nine

## Business Defamation and Disparagement
### (Against All Defendants)

181.   Panini realleges paragraphs 1 through 135.

182.   Several times Fanatics disparaged Panini's business reputation by falsely disseminating derogatory statements to third parties such as players, player agents, player representatives, players associations, and Panini employees.

183.   These statements included statements that Panini *is* incapable of performing for them, will be out of business soon, and lacks the money to pay them—attempting to persuade those third parties that they should not do business with Panini now.

184.   Each of these statements disseminated to those third parties were false, not privileged, and malicious.

185.   Fanatics knew the statements were false or acted in reckless disregard for the fact that the statements were false.  As a result, Fanatics' statements were defamatory or were made negligently and without regard to the truth of the statements.

186.   Fanatics' false and defamatory statements prejudiced Panini's business in the State of Florida and throughout the United States.  They also

deterred third parties from dealing with Panini, including players, player agents, player representatives, players associations, and Panini employees.

187.   Panini has suffered and continues to suffer damages in the State of Florida and throughout the United States because of Fanatics' unlawful conduct, including in the form of reputational damage, lost revenue, lost customers, and loss of goodwill, for which it is entitled to recover actual, special, and punitive damages.

188.   In addition, or in the alternative, each of these statements is false, not privileged, and malicious.   Fanatics knew the statements were false or acted in reckless disregard for the fact that the statements were false.   As such, these statements constitute business disparagement.   Panini has suffered pecuniary damages because of this conduct, including loss of profits and loss of goodwill, entitling Panini to recover actual and punitive damages.

## Jury Demand

189.   Under Rule 38(b) of the Federal Rules of Civil Procedure, Panini demands a trial by jury of all claims asserted in this Complaint so triable.

## **Prayer for Relief**

190.   WHEREFORE, Panini requests entry of judgment:

a.   declaring, ordering, and adjudging that the conduct challenged here unreasonably restrained trade, monopolized or attempted to monopolize one or more markets, or otherwise violated the Sherman or Clayton Antitrust Acts—or both—and, further, that it was illegal and tortious under State law;

b.   permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, the conduct challenged here;

c.   ordering Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) to divest itself of its control over GCP to restore competition to the Relevant Markets or in the alternative permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, or carry out any action to use its control over GCP to harm, or threaten to harm, Panini;

d.   ordering Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) to divest itself of the assets associated with Topps to restore competition in the Relevant

Markets or in the alternative permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, or carry out any action to use the Topps assets to harm, or threaten to harm, Panini.

e.      permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, or carry out, threats against Panini employees or to use such statements or other unlawful means in seeking to hire Panini employees;

f.      permanently enjoining Fanatics (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, or carry out, the dissemination of false, derogatory statements about Panini to third parties such as players, player agents, player representatives, players associations, and Panini employees,

g.      Awarding Panini its full monetary damages to be proven at trial;

h.      Awarding Panini treble its monetary damages, pursuant to 15 U.S.C. § 15;

i.      Awarding Panini pre- and post-judgment interest on its damages;

53

j.      Awarding Panini the costs of this action and reasonable attorneys' fees pursuant to 15 U.S.C. § 15 and Chapter 501, Fla. Stat.; and

k.      Awarding Panini any other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Stuart H. Singer

David Boies*                                  Stuart H. Singer (FBN 377325)
  *Lead Counsel                               Sabria A. McElroy (FBN 95657)
(*pro hac vice forthcoming*)                  Jason Hilborn (FBN 1008829)
Boies Schiller Flexner LLP                    Boies Schiller Flexner LLP
333 Main Street                               401 East Las Olas Blvd.
Armonk, NY  10504                             Suite 1200
(914) 749-8200                                Fort Lauderdale, FL  33301
(914) 749-8300 (fax)                          (954) 356-0011
dboies@bsfllp.com                             (954) 356-0022 (fax)
                                              ssinger@bsfllp.com
                                              smcelroy@bsfllp.com
Sean Phillips Rodriguez                       jhilborn@bsfllp.com
(*pro hac vice forthcoming*)
Boies Schiller Flexner LLP
44 Montgomery Street                          James P. Denvir
41st Floor                                    (*pro hac vice forthcoming*)
San Francisco, CA  94104                      Richard A. Feinstein
(415) 293-6800                                (*pro hac vice forthcoming*)
(415) 293-6899 (fax)                          Boies Schiller Flexner LLP
srodriguez@bsfllp.com                         1401 New York Ave, NW
                                              Washington, DC  20005
                                              (202) 237-2727
                                              (202) 237-6131 (fax)
                                              jdenvir@bsfllp.com
                                              rfeinstein@bsfllp.com

                                              *Counsel for Panini America, Inc.*