# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PANINI AMERICA, INC.

*Plaintiff*,

v.

FANATICS, INC.,  FANATICS, LLC,  FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC., FANATICS SPV, LLC, and FANATICS HOLDINGS, INC.

*Defendants.*

**Case No. 8:23-CV-1721-KKM-AEP**

## <u>MOTION TO TRANSFER TO THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND MEMORANDUM IN SUPPORT</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ........................................................................... 1

II.   FACTUAL BACKGROUND ....................................................... 3

III.  ARGUMENT ................................................................................ 5

     A.    A Mandatory Forum-Selection Clause Requires Transfer To
          New York ........................................................................... 7

     B.    Public and Private Interest Factors Favor Transfer ........................... 11

     C.    Two Minimal Factors Are Neutral ................................................... 18

     D.    Panini's Choice of Forum Should Be Given Zero or Little
          Deference ........................................................................... 19

IV.  CONCLUSION ........................................................................... 19

## I.  INTRODUCTION

Defendants respectfully file this Motion to Transfer this case to the Southern District of New York because that is where it belongs.[1]  Plaintiff Panini America, Inc. ("Panini"), which bills itself as the "*world's largest sports and entertainment collectibles company*,"[2] is headquartered in Dallas, Texas, while its parent company resides in Italy.  It brings this antitrust case against **New York**-based Fanatics Collectibles to complain about Fanatics Collectibles' licenses with **New York**-based professional sports leagues and players associations and other conduct that took place in **New York**.  Many of the party witnesses are in **New York** because three of the five Fanatics entities named as defendants have their principal places of business in **New York**.  Critical key third party witnesses from the **New York**-based leagues and players associations are likewise in **New York**, and will testify about why they entered into the licenses at issue—licenses that are at the core of Panini's antitrust case and that identify **New York** as the venue for resolving disputes concerning those agreements.  Last but not least, during the failed commercial negotiations underlying this case, Panini agreed with Fanatics Collectibles that it would submit *all claims related to the*

---

[1]     "Defendants" refers to the named Defendants in this case, Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LLC, and Fanatics Holdings, Inc.

[2]     Declaration of Lawrence Buterman ("Buterman Decl.") Ex. 1, Panini Blog, *Panini America Signs Quinn Ewers to Exclusive Autograph Trading Card Agreement* (July 13, 2023), https://blog.paniniamerica.net/panini-america-signs-quinn-ewers-to-exclusive-autograph-trading-card-agreement/; *see also, e.g.*, Buterman Decl. Ex. 2., Panini America Official TikTok ("The world's largest sports and entertainment collectibles company."); Buterman Decl. Ex. 3, Panini America Instagram ("Panini America:  The world's largest sports and entertainment collectibles company (FIFA, NBA, NFL, NFLPA, NASCAR, UFC, WWE, and College).").

*early termination of its licenses* with the leagues "to the exclusive jurisdiction" of **New York courts**.[3]

Florida, in contrast, has nothing to do with the conduct at issue. Panini is not based in Florida; it is a Texas company. Not surprisingly in a dispute between a Texas company and a New York company, Plaintiff's 50-plus page complaint does not identify a single challenged act that took place in Florida. And, perhaps most critically, in this antitrust case challenging Fanatics Collectibles' licenses with the athletes and leagues, those key non-party witnesses are a thousand miles away, beyond this Court's subpoena power.

For the convenience of the parties, witnesses, and the public, and in the interest of justice, this Court should exercise its "broad discretion" under 28 U.S.C. § 1404(a) to transfer this case to the Southern District of New York. *See Norman v. Wilks*, 179 F.R.D. 640, 643 (M.D. Fla. 1998); *United Cap. Funding Corp. v. Ericsson, Inc.*, 2015 WL 13357938, at *1 (M.D. Fla. Feb. 5, 2015). That is where this case should have been brought, and it is where it belongs. Fanatics' trading card business—part of Fanatics Collectibles—resides there; and the locus of operative facts is there. *See supra* Part III.B. Because Panini consented to exclusive jurisdiction and venue there, its decision to file suit here is entitled to no weight. *See infra* Part III.A. Declining to transfer risks

---

[3]   Because of this mandatory forum-selection clause, and because New York is far more convenient for the parties and non-parties, and has the strongest connection to the parties' failed business negotiations regarding certain Panini licenses at issue in this case, Fanatics filed its lawsuit challenging Panini's unfair competition, tortious interference with business relations, and breach of the duty to negotiate in good faith in the Southern District of New York. *See* Complaint, *Fanatics Collectibles TopCo, Inc. v. Panini S.P.A.*, No. 23-cv-06895 (S.D.N.Y. Aug. 7, 2023).

allowing Panini to launch into discovery knowing that Fanatics cannot compel key witnesses to testify in person.   That is precisely the venue gamesmanship that Section 1404(a) seeks to prevent and it is the outcome Panini attempts to engineer here.  This Court should not allow it.

## II.   FACTUAL BACKGROUND

Panini is an odd antitrust plaintiff to say the least:  it has been the leading seller of trading cards in the United States for decades—a position it achieved through, among other things, its use of long-term exclusive licenses with intellectual property holders—which is the precise conduct it now claims violates the antitrust laws.  *See, e.g.*, Compl. ¶¶ 1, 53-54, 104, 110, ECF No. 1.  Panini's CEO has boasted that the company is a "licensing machine" that "[a]t any one time [will] hold as many as 400 licenses," including "almost all the major sports federation licenses and a wealth of entertainment licenses."[4]   Panini has held—often exclusively—numerous sports licenses, including from the National Football League ("NFL"), NFL Players Association ("NFLPA"), Major League Baseball Players Association, National Basketball Association ("NBA"), National Basketball Players Association ("NBPA"), Women's National Basketball Association, Women's National Basketball Players Association, FIFA World Cup, FIFA Women's World Cup, Spanish soccer league LaLiga, French soccer league Ligue 1, and many others.

---

[4]      Buterman Decl. Ex. 4, Chris Olds, Beckett.com, *Panini Reaches Its Goal Faster Than Expected* (Sept.   2011),   www.beckett.com/news/panini-reaches-its-goal-faster-than-expected-with-mlbpa-license/.

Panini's path to becoming an antitrust plaintiff begins with its complacency. It failed to invest in marketing. It didn't invest in innovation. And ultimately, it decided to engage in a long-running sale process that, like its effort to keep its licenses with several key leagues and players associations, failed. As a result, licensors went looking for a fresh alternative. Enticed by the prospect of bringing innovation to the collectibles space, Fanatics established Fanatics Collectibles in New York to negotiate potential licenses relating to trading cards and other products that would bear the leagues' and athletes' marks and images. Winiarski Decl. ¶ 2.[5] Over a more than 18-month period, the NBA, NFL, Major League Baseball, and their respective players associations each decided to partner with Fanatics Collectibles, and move away from Panini once the licenses with Panini came to their natural end. Compl. ¶ 3; Winiarski Decl. ¶ 5.

That is the crux of Panini's case, yet none of the Fanatics licensing agreements that Panini alleges are "critical" to its claims have any connection to Florida. Compl. ¶ 73. Instead, each and every one of those six licenses contains a forum-selection or arbitration clause that identifies New York as the site for resolving disputes concerning those agreements. Winiarski Decl. ¶ 7. The Fanatics Collectibles business that manages the collectibles licenses that are the focus of Panini's complaint was formed in New York, is headquartered there to this day, and was never based in Florida. *Id.* ¶ 2. None of the Fanatics Collectibles business leadership team has an office in

---

[5]    "Winiarski Decl." refers to the contemporaneously filed Declaration of Gregg Winiarski.

Florida.  *Id.*  And Fanatics Collectibles is not aware of Panini or any of the licensors identified in the complaint having any employees relevant to this action in Florida either.  *See id.* ¶¶ 5-6, 15.  Certainly Panini's complaint does not identify any.

Moreover, Fanatics Collectibles believes—based on the leagues' and players associations' standard contract terms—that the licenses that Panini still maintains with several of these leagues and players associations likely also identify New York as the dispute-resolution forum.  *Id.* ¶ 8.  It makes natural sense that the contracting parties selected New York as a convenient forum because all of the leagues and two of the three players associations are headquartered in New York.  *Id.* ¶¶ 5-6.

Panini complains about other conduct that similarly has no connection to Florida.  The Topps collectibles company that Fanatics acquired in 2022 was based in New York—not in Florida—and the company has maintained its headquarters in New York.  Compl. ¶ 74; Winiarski Decl. ¶¶ 9-11.  The printing company GC Packaging that Panini uses to print some of its trading cards is based in Texas.  Compl. ¶ 77; Winiarski Decl. ¶¶ 12-14.  And the employees who chose to leave Panini's Texas offices to pursue a better opportunity with Fanatics Collectibles were not based in Florida either.  Compl. ¶ 99; Winiarski Decl. ¶ 15.  In short, this case has no relevant connection to this forum, and the Court should transfer it to New York.

## III.  ARGUMENT

A court has "broad discretion" under 28 U.S.C. § 1404(a) to transfer any civil action for the "convenience of the parties and witnesses, and in the interest of justice,"

to any district where it might have been brought,[6] *Norman*, 179 F.R.D. at 643-44, to "avoid unnecessary inconvenience to the litigants, witnesses, and the public, and to conserve time, energy, and money." *United Cap. Funding Corp.*, 2015 WL 13357938, at *1 (citation omitted).

The existence of a forum-selection clause of course has a material impact on a court's discretion. The Supreme Court has made clear that Section 1404(a) is the "appropriate means by which to analyze a valid forum-selection clause requiring transfer to another federal district court." *Mattos v. Nat'l W. Life Ins.*, 2022 WL 19569231, at *3 (S.D. Fla. Sept. 14, 2022) (citing *Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49 (2013)). When such a forum-selection clause applies, "a district court should ordinarily transfer the case to the forum specified in that clause," and may only deny a transfer motion "under extraordinary circumstances unrelated to the convenience of the parties." *Atl. Marine*, 571 U.S. at 62. "[T]he practical result is that forum-selection clauses should control except in unusual cases," *id.* at 64, and "the existence of a forum selection clause is essentially dispositive," *Trump v. Twitter, Inc.*, 2021 WL 8202673, at *2 (S.D. Fla. Oct. 26, 2021).

In cases that do not involve valid forum-selection clauses, the Court's authority to transfer pursuant to Section 1404(a) is still "broad enough to allow the court to take

---

[6]     Panini unquestionably could have brought this case in the Southern District of New York because Panini consented to exclusive jurisdiction and venue there. *See infra* Part III.A. Furthermore, Defendants Fanatics Collectibles and Fanatics Holdings reside there, the locus of operative facts is there, *see infra* Part III.B, and primary subject matter jurisdiction is based on questions of federal law, *see* Compl. ¶¶ 9-11.

into account all factors relevant to convenience and/or the interest of justice." *Rsch. Automation, Inc. v. Schrader-Bridgeport, Int'l*, 626 F.3d 973, 978 (7th Cir. 2010).  Courts in this Circuit typically balance various private and public interest factors, including (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to proof; (3) the parties' convenience; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) trial efficiency and the interest of justice.  *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

The analysis changes, however, when a forum-selection clause applies.  A plaintiff's "choice of forum merits no weight" when it brings suit outside of the bargained-for forum, *Atlantic Marine*, 571 U.S. at 63, and the plaintiff bears a "heavy burden of proof" that the clause should not be enforced, *Trump*, 2021 WL 8202673, at *3 (quoting *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991)).  The plaintiff cannot rely on private interest factors to avoid transfer to the stipulated forum, because the Court "must deem the private-interest factors to weigh entirely in favor of the preselected forum."  *Atl. Marine*, 571 U.S. at 64.

### A.    A Mandatory Forum-Selection Clause Requires Transfer To New York

The parties have already decided that New York is the right forum for this case. In April 2022, in connection with Panini's decision to exit certain key licenses early, the parties began discussing in earnest the possibility of a business deal relating to

trading card licensing rights that Panini held, but that Fanatics Collectibles is set to acquire, and that Panini now alleges are anticompetitive.  *See* Compl. ¶¶ 64, 110, 147. The parties entered into a non-disclosure agreement ("NDA") governing their discussions of a "possible negotiated transaction," which states that "[a]ny court action or proceeding arising out of or relating to the subject matter of this Agreement shall be brought only in the federal or state courts located in the borough of Manhattan, New York," and "[e]ach Party agrees and submits to the exclusive jurisdiction of these courts for any such action or proceeding."  Winiarski Decl. ¶ 16.

The law makes clear that this provision compels the transfer of this case.  The parties' use of the phrase "any court action or proceeding arising out of or relating to," *id.*, reflects their intent that the language is "clearly meant to be read broadly."  *Cooper v. Meridian Yachts*, 575 F.3d 1151, 1162 (11th Cir. 2009) (referencing clause with comparable language: "all disputes arising out of or in connection with").  In terms of scope, this litigation "aris[es] out of or relat[es] to the subject matter" contemplated by the NDA's forum selection clause.  That "subject matter" was "a possible negotiated transaction" between Panini and Fanatics Collectibles, where Panini would agree to allow Fanatics Collectibles to assume the remaining terms of the "existing contracts" that Panini now claims Fanatics has tortiously interfered with.  *See* Compl. ¶¶ 1, 7, 64, 110, 169-80; Winiarski Decl. ¶ 16.  Panini's allegations put that possible transaction directly at issue.  Not only did Panini assert claims for interference with those contracts, but it also weaponized alleged statements that Fanatics Collectibles "would soon take over Panini's business *before* Panini's licenses expired"—a direct reference

to the failed commercial negotiations covered by the NDA's forum-selection clause. Compl. ¶¶ 102, 104-05; *see also id.* ¶ 183 (alleging defamation from alleged statements that Panini "will be out of business soon"—another apparent reference to the negotiations covered by the forum-selection clause).  And, of course, Panini alleges that Fanatics Collectibles violates the antitrust laws by entering into licenses with those same licensors.  *Id.* ¶¶ 147-53.

At a more general level, the NDA's forum-selection clause compels transfer because Panini's claims arise from an alleged pattern of "Anticompetitive Conduct" that traces back to the commercial relationship evidenced by the NDA.  *See, e.g.*, Compl. ¶ 2.  The Eleventh Circuit[7] has held that forum-selection clauses containing materially identical language encompass "all causes of action arising directly or indirectly from the business relationship evidenced by the contract."  *Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987) (en banc) (per curiam), *aff'd on other grounds*, 487 U.S. 22 (1988).  In *Stewart*, the Eleventh Circuit held that tort claims and federal antitrust claims were encompassed by a forum-selection clause requiring "any case or controversy arising under or in connection with this Agreement" to be

---

[7]     The contract at issue also contains a choice-of-law clause providing: "This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to any conflict of laws principles."  Winiarski Decl. ¶ 16.  Courts in this Circuit look to federal common law to interpret forum-selection clauses notwithstanding choice-of-law provisions requiring application of state or foreign law.  *See, e.g., Jiangsu Hongyuan Pharm. Co. v. DI Glob. Logistics Inc.*, 159 F. Supp. 3d 1316, 1325 n.4 (S.D. Fla. 2016).  And regardless, the analysis would be the same under Delaware law.  *See, e.g., CVS Pharmacy, Inc. v. AstraZeneca Pharms. L.P.*, 2020 WL 4671659, at *5 (S.D.N.Y. Aug. 12, 2020) (applying Delaware law and holding that "the broad forum selection clause reaches antitrust claims arising from the purchases . . . that were governed by the agreements containing the forum selection clause").

brought in New York, reasoning that "[c]ommercial contractual issues are commonly intertwined with claims in tort or criminal or antitrust law." *Id.* at 1067, 1070.  So too here.  Panini's tort and antitrust claims arise directly—or, at the very least, indirectly—from the business relationship evidenced by the NDA.  Panini's lawsuit centers on Fanatics obtaining football and basketball licenses that Panini formerly held—the same licenses that were the subject of the "possible negotiated transaction" referenced in the NDA.  Panini tries to dodge the NDA's forum-selection clause by omitting references to the NDA and the "potential negotiated transaction"—but Panini may not avoid a mandatory forum-selection clause through "artful pleading."  *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 444 (5th Cir. 2008) (citation omitted); *see Pods, Inc. v. Paysource, Inc.*, 2006 WL 1382099, at *2 (M.D. Fla. May 19, 2006).  Thus, the NDA's forum-selection clause covers the claims alleged here.[8]

The applicability of this mandatory forum-selection clause is "essentially dispositive" for this motion, and requires transfer.  *Trump*, 2021 WL 8202673, at *2.  "The presence of a valid forum-selection clause almost always results in the transfer of a matter to the bargained-for venue and modifies the normal venue analysis."  *N. Am. Elite Ins. Co. v. Stewart & Stevenson*, 2023 WL 3863993, at *6 (S.D. Fla. June 7, 2023); *see also Decurtis LLC v. Carnival Corp.*, 2020 WL 6079232, at *3 (M.D. Fla. July 15,

---

[8]     Moreover, each of the six licensing agreements that Panini challenges contains a forum-selection clause or arbitration clause identifying New York as the forum for dispute resolution.  *See* Winiarski Decl. ¶ 7.  And, Fanatics believes that the exclusive licenses that "Panini currently holds" with the NBA, NBPA, NFL, and NFLPA also direct that disputes be resolved in New York.  Compl. ¶ 1; Winiarski Decl. ¶ 8.

2020) (finding the following forum-selection clause to be mandatory: "[e]xclusive jurisdiction for litigation . . . shall be brought only in").  The Court "must deem the private-interest factors to weigh entirely in favor" of transfer to New York, which is also where they weigh naturally given the presence of most non-party witnesses there. *Atl. Marine*, 571 U.S. at 64.  Panini's choice of this forum "merits no weight," and Panini must carry the burden of showing transfer is against the public interest.  *Id.* at 63.  But those public interest factors will only "rarely defeat a transfer motion."  *Id.* at 64.  And, here, those factors certainly do not preclude transfer because New York has a stronger connection to the litigation (Florida has no relevant connection), and proceeding in New York would promote trial efficiency and the interest of justice.  *See infra* pp.17-18.

### B.   Public and Private Interest Factors Favor Transfer

Not only do the public interest factors squarely point to New York as the appropriate forum, but so do the private interest factors, even setting aside the mandatory forum-selection clause.[9]  The balance of factors in even a traditional Section 1404(a) analysis overwhelmingly weigh in favor of transfer, as the convenience of non-party witnesses, the availability of process to compel the attendance of those witnesses to attend trial, the parties' convenience, the locus of operative facts, access

---

[9]     Because of the forum-selection clause, the Court must deem all of the private interest factors to "weigh entirely in favor of the preselected forum."  *Atl. Marine*, 571 U.S. at 64.  The Court may only consider the private interest factors if it does not apply the forum-selection clause.

to relevant sources of proof, trial efficiency, and the interest of justice all support this case proceeding in the Southern District of New York rather than in this district.

New York is far more convenient for key non-party witnesses.  The convenience of key non-party witnesses is "the single most important factor in the transfer analysis," and it weighs heavily in favor of transfer to New York.  *Sunscreen Mist Holdings v. Snappyscreen, Inc.*, 2019 WL 8405208, at *3 (S.D. Fla. Feb. 11, 2019) (citation omitted); *see also Comp360 LLC v. KT Enters., LLC*, 2022 WL 2441937, at *3 (M.D. Fla. June 23, 2022) (Mizelle, J.).  Panini alleges this case involves a "relevant market" limited to three sports leagues in the United States and their player associations, which make up six non-party entities.  Compl. ¶¶ 32, 34.  Although this alleged market is facially implausible, and Panini's own public statements contradict it,[10] these allegations demonstrate that discovery or trial in this case (should Panini survive dismissal) would focus on those entities.  Five of the six entities are headquartered in New York, one in Washington, D.C., and none in Florida.  Winiarski Decl. ¶¶ 5-6.  Hence, the non-party witnesses that can testify about the operation and management of those licenses are primarily in New York—not Florida—and "[t]he convenience of the witnesses is best served when witnesses are allowed to testify in the forum where they reside." *Morrissey v. Subaru of Am.*, 2015

---

[10]     For example, Panini's public statements describe a much broader market in which Panini claims to be the "world leader in officially licensed collectibles," including products licensed by entertainment brands, video games, and "other key property from many other licensors," in addition to sports.  Buterman Decl. Ex. 5, Tracey Hackler, The Official Panini America Blog, *Break: NFL Players Inc., Panini America Announce Exclusive Long-Term Agreement* (July 31, 2014), www.paniniamerica.wordpress.com/2014/07/31/breaking-nfl-players-inc-panini-america-announce-exclusive-long-term-agreement/ (quoting Panini CEO Mark Warsop).

WL 9583278, at *3 (S.D. Fla. Dec. 31, 2015).  The six entities that unilaterally decided in 2021 and 2022 to partner exclusively with Fanatics made clear that they consider New York to be convenient by stipulating it as the site for dispute resolution about the challenged licenses.  Winiarski Decl. ¶ 7.

Process is available to compel the attendance of key non-party witnesses in New York, but not in Florida.  Because a federal court's subpoena power is limited under Rule 45, this Court "cannot compel any unwilling witnesses residing outside of Florida to testify."  *Pejcic v. Choice Hotels Int'l*, 2019 WL 13234105, at *5 (S.D. Fla. June 25, 2019).  That limitation would prevent this Court from securing live testimony from *any* of the key non-party witnesses.  A court in New York, by contrast, could ensure live testimony from at least five of the six licensors that Panini alleges are in the relevant market, and also of other licensors that compete with them.  "Given that live testimony is generally preferred over other means of presenting evidence," this factor heavily favors transfer.  *Id.*; *see also Comp360*, 2022 WL 2441937, at *3 (weighing that "this Court may also be unable to subpoena" non-party witnesses).

The parties' convenience favors transfer to New York.  The Southern District of New York is undoubtedly the most convenient forum for Defendants as well, because Fanatics' trading card businesses—Fanatics Collectibles and The Topps Co.— are headquartered there, and the key business employees with relevant knowledge all reside in or near New York.  Winiarski Decl. ¶¶ 2, 9-11.  None of the officers involved in the management of Fanatics Collectibles' trading card business or the challenged licenses reside in Florida.  *Id.* ¶ 2.

Panini baldly claims that each of the Fanatics businesses maintains "its principal place of business in this District."  Compl. ¶¶ 20-24.  That is false:  three of the five named defendants (Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LLC, and Fanatics Holdings, Inc.) are headquartered in New York.  Winiarski Decl. ¶¶ 2-3.  A fourth named defendant, Fanatics, Inc., does not exist, and "Fanatics, LLC" (also known as Fanatics Commerce)—is not alleged to have any connection to the licenses at issue in this case.  *Id.* ¶ 4.  Panini appears to rely on "Fanatics' website" for its mistaken claims about these entities' locations.  Compl. ¶ 14.  But that website clearly shows New York as the headquarters for the Fanatics Collectibles business, as well as Fanatics Holdings, and Florida offices existing for unrelated Fanatics Commerce and Fanatics Brands.  *See* Buterman Decl. Ex. 6, Fanatics "Global Footprint" Webpage.  Panini cannot resist transfer by incorrectly listing Defendants' locations, or group-pleading entities that have no connection to the claims alleged.  *See, e.g.*, *Murphy v. Trans Union, LLC*, 2012 WL 3536322, at *1 n.3 (E.D. Pa. Aug. 15, 2012); *see also King v. Lassen*, 2010 WL 11601212, at *2 (C.D. Cal. Sept. 3, 2010) (relying on declaration from knowledgeable employee to resolve dispute about entities' place of business).

Panini has no relevant connection to Florida either, as it is based in Texas and Italy.  Compl. ¶¶ 18-19.  Panini cannot be heard to complain that New York is inconvenient because its declared "lead counsel" is based there, *see id.* p.55, New York is easily accessible by plane from Texas or even Italy, and Panini's principals and attorneys have traveled to New York several times in the past month to discuss a

14

business agreement (and even Panini's threatened lawsuit).  Lest there be any doubt, the forum-selection clause to which the parties agreed would, if nothing else, evidence that Panini and its parent are well positioned and prepared to litigate in New York. Because Panini will be required to "engage in similar cross-country travel," or even international travel, to attend trial in either forum, and because New York is far more convenient for Defendants, "this factor weighs heavily in favor of transfer." *Pejcic*, 2019 WL 13234105, at *5.

The operative facts occurred in New York, not in Florida.  "The locus of operative facts is a primary factor in determining whether to transfer venue." *Est. of Brooks v. United States*, 2020 WL 4923639, at *5 (S.D. Fla. Jan. 22, 2020) (citation omitted).  In cases that allege an antitrust violation based on challenged contracts or agreements, the "locus of operative facts" is "where the defendants allegedly conspired or colluded to violate the antitrust laws." *Assoc. Wholesale Grocers, Inc. v. Koch Foods, Inc.*, 2018 WL 4361188, at *5 (D. Kan. Sept. 13, 2018).  The majority of the IP licensing agreements that Panini challenges in this case were negotiated by parties with their headquarters in the Southern District of New York.  Winiarski Decl. ¶¶ 2, 5.

The locus of the events surrounding the acquisitions of Topps and GC Packaging—which Panini also challenges, Compl. ¶¶ 4, 77, 93-96—similarly are focused directly on New York.  One of those businesses is based in New York (the other is in Texas), negotiations to acquire those businesses were directed from New York or from attorney offices in Washington, D.C., and neither of those businesses is based in Florida.  Winiarski Decl. ¶¶ 9-14.  These facts resemble *Fox News Network v.*

*Time Warner, Inc.*, where the court determined, in an antitrust case challenging a business acquisition, that "[t]he locus of operative facts in this case is primarily in Manhattan, where Manhattan-based Time Warner acquired Turner Broadcasting," and then transferred the case to the Southern District of New York.  1997 WL 271723, at *3 (E.D.N.Y. May 16, 1997); *see also FTC v. Graco*, 2012 WL 3584683, at *5 (D.D.C. Jan. 26, 2012) (transferring to where the merger agreement "was negotiated, drafted, and executed").  Florida, by contrast, was not the site of any of the relevant negotiations for these acquisitions.  *See FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 26 (D.D.C. 2008) (transferring when "[n]one of the negotiations . . . at the heart of this controversy took place" where the suit was filed).

Despite stretching nearly 200 paragraphs, the complaint does not identify a single relevant action that took place in Florida—because none did.  Nor can the conclusory allegation that "a substantial part of the events giving rise to Panini's claims occurred" in this District, Compl. ¶ 14, alter that reality.  *See Miller Masonry, Inc. v. EMB Quality Masonry*, 2014 WL 5340747, at *3 (E.D. La. Oct. 20, 2014) (holding that plaintiff failed to carry "its burden to establish that a substantial part of the events giving rise to its claim occurred in [its chosen] venue" where it provided only "conclusory statements" to that effect).

<u>The location of relevant documents, if anywhere, is primarily New York</u>.  As multiple courts have recognized, in the modern digital age, the physical location of documents "is a minor consideration."  *Stokes v. Markel Am. Ins. Co.*, 2019 WL 8017457, at *4 (S.D. Fla. June 28, 2019) (citation omitted).  Nonetheless, where the

16

locus of operative facts is New York, the vast majority of Defendants' relevant employees reside in New York, and nearly all key non-party witnesses are in New York, "it similarly follows that the location of relevant documents and the relative ease of access to sources of proof . . . favor transfer to New York." *Sunscreen Mist*, 2019 WL 8405208, at *3.

 <u>Resolving this case in New York would promote trial efficiency and the interest of justice.</u>  "[T]he interests of justice would be better served by transferring venue" to the Southern District of New York "[b]ecause this case's locus of operative facts is New York and most of the material witnesses reside in New York." *Fairstein v. Netflix, Inc.*, 2020 WL 5701767, at *10 (M.D. Fla. Sept. 24, 2020).  "[T]he federal district in which a company is headquartered has a unique and compelling interest in adjudicating claims relating to that company." *Maxon v. Sentry Life Ins. Co.*, 2018 WL 3850011, at *4 (M.D. Fla. Apr. 11, 2018) (citation omitted).  It follows that the Southern District of New York has the greatest local interest in this dispute, as it is the headquarters for multiple Defendants and entities central to this dispute, including all of the alleged co-conspirator leagues and players associations (except one) and the Topps Co. that Panini seek to make Fanatics divest.  This district, by contrast, has correspondingly "little interest in disputes between foreign business[es]," which is exactly what this case involves.  *Sunscreen Mist*, 2019 WL 8405208, at *4 (citation omitted).  And it makes no sense to further burden this district's judicial resources with

this case when these parties, non-parties, and allegations have no relevant "ties to Florida."  *Id.*

Furthermore, although this case should be dismissed at the earliest opportunity, there would be an undeniable "unfairness in imposing jury duty on citizens in an unrelated forum" if this case were to reach trial.  *Stokes*, 2019 WL 8017457, at *6 (citation omitted).  The "community with the most significant interest in this matter is simply not the [Middle] District of Florida," *MindbaseHQ LLC v. Google LLC*, 2021 WL 1923142, at *6 (S.D. Fla. May 13, 2021), it is the Southern District of New York.  It would promote the "local interest in having localized controversies decided at home" to transfer this case there.  *Stokes*, 2019 WL 8017457, at *6.

## C.     Two Minimal Factors Are Neutral

The relative means of the parties and the forum's familiarity with governing law are minor factors that rarely have any bearing on the transfer analysis, and those weigh neutrally here.  *See Harman v. Taurus Int'l Mfg.*, 2021 WL 5176510, at *4-5 (S.D. Fla. Oct. 18, 2021).  The forum's familiarity with the governing law "is one of the least important factors in determining a motion to transfer, especially where no complex questions of foreign law are involved."  *Id.* (citation omitted).  Generally, federal courts "are equally familiar with federal law," *Beckman Coulter, Inc. v. Sysmex America, Inc.*, 2018 WL 4901407, at *4 (S.D. Fla. Sept. 26, 2018), and Florida's Deceptive and Unfair Trade Practices Act "is modeled after its federal counterpart, the Federal Trade Commission Act," *Camoco, LLC v. Leyva*, 2018 WL 6166302, at *5 (M.D. Fla. Sept. 21, 2018).

### D.    Panini's Choice of Forum Should Be Given Zero or Little Deference

Panini's decision to bring suit here, ignoring a mandatory forum-selection clause, is entitled to "no weight." *Atl. Marine*, 571 U.S. at 63.  Even absent the forum-selection clause, however, Panini's tactical selection of this forum as one where Panini could avoid confronting the non-party witnesses who would debunk its claims, as well as the established precedent that forecloses its legal theories, would be entitled to little, if any, weight in the standard Section 1404(a) analysis.  Panini cannot assert any credible connection between this district and the challenged business conduct, the parties, or key non-party witnesses.  Thus, "because Plaintiff does not reside here and the operative facts occurred outside this forum, this factor receives significantly less consideration and is neutral." *Pejcic*, 2019 WL 13234105, at *6.  Given that "the 'locus of operative facts' is in [New York] rather than in Florida," "the already minimal weight accorded Plaintiff's choice of forum is entitled to even less deference and does not override the factors weighing in favor of transfer." *Stokes*, 2019 WL 8017457, at *5.  Ultimately, New York "has the strongest connection to this case and transfer is therefore warranted." *MindbaseHQ*, 2021 WL 1923142, at *7.

## IV.   CONCLUSION

The forum-selection clause required Panini to bring this lawsuit in New York, and Panini cannot carry its burden to avoid transfer there.  Alternatively, the traditional factors under Section 1404(a), including the convenience of critical non-party witnesses and the ability to secure their live testimony, the parties' convenience, the locus of operative facts, access to sources of proof, trial efficiency,

and the interest of justice, weigh overwhelmingly in favor of transfer to the Southern District of New York.  Accordingly, the Court should transfer this case there pursuant to 28 U.S.C. § 1404(a).[11]

Dated:  August 14, 2023                    Respectfully submitted,

_/s/ William J. Schifino, Jr._
William J. Schifino, Jr., Esq.
Florida Bar Number 564338
John A. Schifino, Esq.
Florida Bar Number 72321
Justin P. Bennett, Esq.
Florida Bar Number 112833
Gregory L. Pierson, Esq.
Florida Bar Number 123905
Audrey A. Gangloff, Esq.
Florida Bar Number 1021343
**GUNSTER, YOAKLEY**
**& STEWART, P.A.**
401 E. Jackson Street, Suite 1500
Tampa, Florida 33602
Telephone: (813) 228-9080
Facsimile: (813) 228-6739
wschifino@gunster.com
jschifino@gunster.com
jbennett@gunster.com
gpierson@gunster.com
agangloff@gunster.com
cwarder@gunster.com
asnaggs@gunster.com

Michael G. Tanner, Esq.
Florida Bar Number 261300
**GUNSTER, YOAKLEY**
**& STEWART, P.A.**

Lawrence E. Buterman (_pro hac vice_ forthcoming)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Amanda P. Reeves (_pro hac vice_ forthcoming)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Christopher S. Yates (_pro hac vice_ forthcoming)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

Michael B. Carlinsky (_pro hac vice_ forthcoming)
**QUINN EMANUEL**
51 Madison Ave, 22nd Floor
New York, NY 10010
michaelcarlinsky@quinnemanuel.com
(212) 849-7000

---

[11]     Fanatics respectfully preserves all available defenses and intends to raise all available defenses should the Court deny the motion to transfer.

1 Independent Drive, Suite 2300
Jacksonville, Florida 32202
Telephone: (866) 915-7185
Facsimile: (904) 354-2170
mtanner@gunster.com

Derek L. Shaffer (*pro hac vice*
forthcoming)
Christopher G. Michel (*pro hac vice*
forthcoming)
**QUINN EMANUEL**
1300 I Street NW, 9th Floor
Washington, DC 20005
derekshaffer@quinnemanuel.com
christophermichel@quinnemanuel.com
(202) 538-8000

*Counsel for Defendants*

21

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 3.01(g)

I hereby certify that counsel for Defendants has conferred over teleconference with Plaintiff's counsel, Stuart H. Singer, of Boies Schiller Flexner LLP, on August 14, 2023, who advised that Plaintiff opposes the relief requested in this motion.

Respectfully submitted on August 14, 2023.

/s/ William J. Schifino, Jr.
William J. Schifino, Jr.

## CERTIFICATE OF SERVICE

I certify that on August 14, 2023, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ William J. Schifino, Jr.
William J. Schifino, Jr.