UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PANINI AMERICA, INC.

    *Plaintiff,*

    v.                                   **Case No. 8:23-CV-1721-KKM-AEP**

FANATICS, INC.,
FANATICS, LLC,
FANATICS COLLECTIBLES
INTERMEDIATE HOLDCO, INC.,
FANATICS SPV, LLC, and
FANATICS HOLDINGS, INC.

    *Defendants.*
_____/

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO TRANSFER**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

   I.     Fanatics is a Florida-based Company ....................................................... 3

   II.    Fanatics's Corporate Entities Operate as One Company ......................... 5

ARGUMENT ......................................................................................................... 7

   I.     This District is the Proper Venue ............................................................. 7

         A.     Private and Public Factors Weigh in Favor of this Forum ........... 8

         B.     The Remaining Factors Are Neutral ............................................ 12

   II.    The NDA Forum-selection Clause is Inapplicable Here ........................ 15

CONCLUSION .................................................................................................... 17

## INTRODUCTION

For its entire corporate existence going back to 1995, Fanatics has represented itself as—and consistently been known as—being headquartered in Florida. *See infra* at 3-7. And Florida is where Fanatics was based during the conduct that Fanatics admits (at 4) is "the crux" of this case—its securing exclusive licensing deals of unprecedented length with all the Major U.S. Professional Sports Leagues (NFL, NBA, and MLB) and their players associations. For these reasons, no other forum has a stronger interest in this dispute or is better suited to resolve it. *See Ohio Cas. Ins. Co. v. Timber Dev. Corp.*, 2013 WL 12148854 (M.D. Fla. Jan. 23, 2013) (denying motion to transfer where defendants were headquartered in Florida).[1]

Fanatics's attempt to transfer this case to the Southern District of New York—where four days after Panini filed this case, Fanatics filed its own complaint—rests on arguments that are factually specious and meritless. *First*, there is Fanatics's claim that the parent company of the business that manages its trading card operations—Fanatics Holdings—has "***never***" been headquartered in Florida. Winiarski Decl. ¶¶ 2-3. This assertion is contradicted by Fanatics's own prior statements, including in filings with other

---

[1] *See also Callasso v. Morton & Co.*, 324 F. Supp. 2d 1320, 1331 (S.D. Fla. 2004) ("A plaintiff's choice of forum is usually accorded deference, particularly where the forum is the defendant's home forum."); *Williams v. Robert Half Int'l Inc.*, 2020 WL 12655622, at *2-3 (N.D. Cal. Sept. 18, 2020) ("Since [the defendant] is headquartered in the [forum], the forum has an interest in the parties and subject matter" and in resolving the controversy.).

1

federal courts and the SEC, that it is a Florida-based company—a fact confirmed repeatedly in press coverage and by public records. *See infra* at 3-7.[2]

*Then*, there is Fanatics's contention that this dispute is subject to a forum-selection clause identifying New York as the venue. While discussing this clause at length, Fanatics glosses over the fact that it appears in ***a non-disclosure agreement*** ("NDA") and Fanatics ignores that this clause relates ***only to the subject of the NDA***, which concerns preserving the confidentiality of certain information exchanged between the parties for a transaction that never occurred. In other words, because Panini has not sued "for breach of the NDA, or for disclosures that were made pursuant to the covered negotiations," the clause is irrelevant. *In re Orange, S.A.*, 818 F.3d 956, 962 (9th Cir. 2016).

Panini's choice of forum in this first-filed suit is entitled to considerable deference and, "unless the balance is strongly in favor of [Fanatics]," Panini's choice of forum should not be disturbed. *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica*, S.A., 382 F.3d 1097, 1101 (11th Cir. 2004).[3]

---

[2] Moreover, Fanatics's Commerce and Brands lines of business, which Fanatics does not deny remain Florida-based, also played a key role in Fanatics's unlawful conduct. *See infra* at 9-10.

[3] *See also Pelc v. Nowak*, 2011 WL 4481571, at *6 (M.D. Fla. Sept. 27, 2011) ("Transfer is appropriate only when a defendant establishes that the balance weighs strongly in favor of transfer."); *Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268, 1277 (S.D. Fla. 2020) (citations omitted) ("Traditionally, a plaintiff's choice of forum is accorded considerable deference, and, '[u]ltimately, transfer can only be granted where the balance of convenience of the parties strongly favors the defendant.'").

Fanatics does not come close to meeting this high bar. Fanatics is a Florida-based company, key events giving rise to this dispute took place in Florida, and this suit belongs where Panini filed it.[4]

## FACTUAL BACKGROUND

### I. Fanatics is a Florida-based Company

Fanatics's history with Florida began in 1995, when "Jacksonville-based Fanatics, Inc." debuted in Orange Park Mall. Ex. 1, at 2.[5] In 1997, it opened a second store—also in Florida. Ex. 3, at 2. Its founders then focused on developing an online business. Ex. 2, at 2.[6]

Around April 2015, Fanatics sought to "determine the best location to establish its corporate headquarters" of the future. Ex. 4, at 1. Stressing challenges it faced if it stayed in Jacksonville, Fanatics lobbied the State of Florida and the City of Jacksonville for $1.4 million in incentives. Exs. 4, 5. To that end, the City of Jacksonville adopted a resolution "to support the expansion of [Fanatics's] operations in Jacksonville" by committing to certain amounts of "financial support." Ex. 6, at 1. And so, Fanatics "expand[ed] its

---

[4] Fanatics has requested oral argument. ECF No. 26. Panini does not believe oral argument is necessary given, among other things, the overwhelming facts showing that Fanatics is a Florida-based company. However, if the Court finds it is necessary to the resolution of the Motion to resolve the conflict between the Declaration of Fanatics's CLO, Gregg Winiarski, ECF No. 24-1, and the information provided herein, Panini respectfully requests that it be permitted to depose Mr. Winiarski.
[5] Exhibits attached to the accompanying Declaration of Jason Hilborn are cited to as "Ex __."
[6] Fanatics was originally founded by two brothers, Alan and Mitchell Trager, who sought to provide gear to fans of the Florida teams like the "Jags, Gators, and Seminoles." Ex. 2, at 2.

3

headquarters in Jacksonville" in May 2015 by "leasing 58,000 square feet of office space" at "8100 Nations Way" in Jacksonville, Ex. 7, at 2, where it remains today, Ex. 8, at 1.

Fanatics's presence extends from its Jacksonville headquarters to Tampa and throughout Florida. In 2020, Fanatics—which at the time "already ha[d] a large presence in several locations throughout Tampa"—executed a "massive" deal for 92,000 square feet of office space for another headquarters in Tampa. Ex. 9, at 2; *see also* Ex. 10. Its Tampa office serves as the headquarters of what Fanatics calls "Brands," which is its in-house apparel division, Ex. 11, and as the location for its manufacturing and distribution, Ex. 12. Fanatics also has offices in Lake Mary and Miramar, Exs. 13, 14, and lists job openings in Orlando and Miami, Ex. 15. It is for all these reasons that both national and local media organizations for years have consistently referred to Fanatics as being based or headquartered in Florida.[7]

---

[7] **Wall Street Journal** (Ex. 16, at 1 ("Jacksonville, Fla.-based Fanatics said this week that Greg Abovsky started as chief financial officer for the collectibles business")); **CNBC** (Ex. 17, at 2 ("Florida-based Fanatics")); (Ex. 18, at 2 ("The Florida-based company expanded into the collectibles business")); **Axios Pro** (Ex. 19, at 2 ("The Jacksonville, Florida-based company is valued at $31 billion")); **Bloomberg** (Ex. 20, at 3 ("In December, the Jacksonville, Florida-based company raised $700 million, valuing it at $31 billion.")); (Ex. 21, at 2 ("The Jacksonville, Florida-based company")); (Ex. 22 ("the Jacksonville, Florida-based company")); (Ex. 8, at 1 (listing address as "8100 Nations Way Jacksonville, FL 32556")); **Business Insider** (Ex. 23, at 3 ("Florida-headquartered company")); **Forbes** (Ex. 24 ("Headquarters Jacksonville, Florida")); **Front Office Sports** (Ex. 25, at 2 ("Florida-based Fanatics")); **Crunchbase** (Ex. 26, at 1 ("The Jacksonville, Florida-based sports giant")); **The Florida Times-Union** (Ex. 27 ("NFL buys 3 percent equity stake in Jacksonville-based Fanatics")); (Ex. 28, at 1 ("One possible bidder for the NFL's Carolina Panthers has significant business

4

## II. Fanatics's Corporate Entities Operate as One Company

Fanatics's various entities operate as an enterprise and hold themselves out as one, unified entity. Compl. ¶ 25. To be sure, this unified entity is often called "Fanatics, Inc.," which Fanatics now claims "no longer exists." Winiarski Decl. ¶ 4. But it is far from clear this is true. Indeed, Fanatics's website even now includes this disclaimer: "© Fanatics, Inc., 2023. … No portion of this site may be reproduced or duplicated without the express permission of Fanatics, Inc.," Ex. 37, at 7—an impossibility if Fanatics, Inc. no longer exists. Plus, Fanatics's declarant here—its Chief Legal Officer—represents to the world on LinkedIn that he is employed by "Fanatics, Inc." Ex. 38, at 2.

Even under Fanatics's telling, where Fanatics, Inc. "was converted into Fanatics, LLC," Winiarski Decl. ¶ 4, that entity is still based in Florida. In its briefing, Fanatics does not disclose that it has stated in filings with other federal courts that Fanatics, LLC "is the successor to Fanatics, Inc.," that Fanatics, LLC "***has no parent corporation***," and that Fanatics, LLC has "its principal place of business ***in Florida***." Fanatics, LLC's Fed. R. Civ. P. Rule

---

ties to Jacksonville. Michael Rubin, owner and executive chairman of Jacksonville's Fanatics Inc.")); (Ex. 29, at 1 ("The Jacksonville-based company")); **Tampa Bay Times** (Ex. 30, at 1 ("Fanatics, a Jacksonville-based company that has its design hub in Tampa")); **Tampa Bay Business Journal** (Ex. 9, at 2 ("Jacksonville-based Fanatics has leased 92,000 square feet—the top three floors—of the Laser Spine building in Avion Park")); **Jacksonville Daily Record** (Ex. 31, at 1 ("the Jacksonville-based online sports merchandising giant started with a single retail store in the Orange Park Mall.")); (Ex. 32, at 1 ("Jacksonville-based")); (Ex. 33, at 1 ("Jacksonville-based")); **Jacksonville Business Journal** (Ex. 34, at 2 ("Jacksonville-based")); (Ex. 35, at 2 ("Jacksonville-based")); **First Coast News** (Ex. 36 ("One of the largest employers on the First Coast")).

5

7.1 Disclosure Statement, *Hastings v. National Football League, Inc.*, Case No. 3:21-cv-09908 (Mar. 8, 2022), ECF No. 32 (emphases added). So, the exact status of Fanatics, Inc. is irrelevant. Whether you call "Fanatics" by Fanatics, Inc.—as its website and its CLO still do—or by Fanatics, LLC, for decades Fanatics has operated, and currently does operate, its principal place of business in this District. Fanatics, Inc., and LLC are undisputedly headquartered in this District.

That leaves Fanatics Collectibles Intermediate HoldCo., Inc., Fanatics SPV, LLC, and Fanatics Holdings, LLC. Fanatics's CLO admits that its trading card operations are part of its Fanatics Collectibles business, which includes Fanatics Collectibles Intermediate Holdco., Inc. and Fanatics SPV, LLC. Winiarski Decl. ¶ 2. The Westlaw Company Investigator Reports for both Fanatics SPV, LLC and Fanatics Collectibles Intermediate HoldCo., Inc. list the same Florida address as Fanatics, Inc.'s (or LLC's) longstanding headquarters: 8100 Nations Way, Jacksonville, FL 32256. Exs. 39, 40; *see also* Ex. 41 (Westlaw Company Report for Fanatics, Inc. listing "8100 Nations Way"); Ex. 42 (Westlaw Company Report for Fanatics, LLC listing "8100 Nations Way"); Ex. 43 (Westlaw Company Report for Fanatics Holdings, LLC listing "8100 Nations Way"). And in any event, Fanatics says both Intermediate HoldCo and Fanatics SPV fall under "the ultimate parent" of Fanatics Holdings, Inc. Winiarski Decl. ¶¶ 2-3. Fanatics's CLO declares—

under penalty of perjury—that Fanatics Holdings "has ***never*** been headquartered in Florida." Winiarski Decl. ¶ 3 (emphasis added). This is flatly inconsistent with filings Fanatics Holdings made with the federal government. ***After*** the exclusive deals between Fanatics, the leagues, and players associations were announced in August 2021, Fanatics Holdings filed with the SEC a Form D, in which it represented that Fanatics Holdings's principal place of business remained where Fanatics has always been: 8100 Nations Way, Jacksonville, FL 32256. Ex. 44, at 1. In that same filing, Fanatics Holdings represented that its CEO (Michael Rubin), its CFO, its Secretary, and every Director also resided at 8100 Nations Way. *Id.*, at 1-4.

In short, Fanatics is a Florida-based company with ***multiple*** headquarters in this District. Compl. ¶ 14.

## ARGUMENT

### I.   This District is the Proper Venue

While Fanatics now seeks to disown its home State, no court filing can erase the nearly three decades of history between the State of Florida, its political subdivisions, and Fanatics. Nor can it change the fact that Fanatics was based in Florida during the main conduct at issue here: its securing exclusive licensing deals of unprecedented length with all the Major U.S. Professional Sports Leagues (NFL, NBA, and MLB) and their players associations, which facilitated its campaign of further anticompetitive and

7

tortious conduct. Compl. ¶¶ 67–123. This case belongs in this forum and Fanatics's request to transfer it to New York should be denied.

To determine the appropriateness of transfer under 28 U.S.C § 1404(a), "courts assess whether convenience and the interest of justice require transfer to the requested forum." *Fruitstone*, 464 F. Supp. 3d at 1277. In this circuit, courts generally look to the nine factors articulated in *Manuel v. Convergys Corp.* to guide this analysis. 430 F.3d 1132, 1135 n.1 (11th Cir. 2005). Application of those factors here clearly demonstrates that Florida is the most appropriate forum for Panini's claims.

### A.    Private and Public Factors Weigh in Favor of this Forum

First, Factor (8) requires deference to Panini's choice of forum. Like its other arguments, Fanatics's contention (at 19) that Panini's forum choice should be given "minimal weight" because Panini does not reside here ignores Fanatics's own close connections to and history with this forum. *See Ohio Cas. Ins.,* 2013 WL 12148854, at *3-4 (affording deference to plaintiff's choice of forum where defendants were headquartered in Florida and rejecting defendants' argument that deference should be "minimal" because it was not plaintiff's home forum).[8] Indeed, it would make little sense to deny the

---

[8] *See also Strigliabotti v. Franklin Res., Inc.*, 2004 WL 2254556, at *4 (N.D. Cal. Oct. 5, 2004) (finding that defendants' business connections to district in which suit was filed weighed against transfer and denying motion to transfer); *Radiation Stabilization v. Varian*, 2012 WL 1886456, at *2 (N.D. Ill. May 17, 2012) (same).

8

deference ordinarily afforded to a plaintiff's choice of forum when a plaintiff sues in defendant's backyard, rather than its own. Panini's choice is entitled to considerable deference and Fanatics has offered no basis to disturb it. *See SME Racks,* 382 F.3d at 1000-01.

Next, Factor (4)—the locus of operative facts—establishes that Florida is the venue best-suited to resolve this matter. While acknowledging (at 15) that the locus of operative facts is a primary factor in determining whether to transfer venue, Fanatics claims that Fanatics Holdings, which Fanatics describes as the "ultimate parent" of the Fanatics Collectibles business, is headquartered in New York. Winiarski Decl. ¶ 3. Therefore, says Fanatics, the operative facts occurred there. But, as detailed above, *see supra* at 3-7, Fanatics's ties to this district are in fact strong and longstanding. And in September 2021—***after*** the unprecedented exclusive deals between Fanatics, the leagues, and players associations were announced—Fanatics told the SEC that Fanatics Holdings was headquartered in Florida. Ex. 44. So even if Fanatics Holdings has absconded from Florida, it operated from Fanatics's historical principal place of business in this State at least during the conduct that Fanatics admits (at 4) is "the crux" of this case—its securing exclusive deals of historically unprecedented length.

And even Fanatics does not deny that its Commerce and Brands offices remain in Florida. Fanatics asserts (at 14) that these lines of business are

9

"unrelated" to this case. But this claim ignores a key element of the anticompetitive conduct detailed in the complaint that directly implicates the Brands and Commerce lines of business responsible for the design, manufacturing, and sale of merchandise, jerseys, and other apparel. *See* Winiarski Decl. ¶ 4. One of many innovative elements that Panini offers to trading-card consumers is the inclusion in important lines of certain cards of a piece of a player's jersey integrated into that player's trading card. Critical to that offering is obtaining the jerseys themselves which, for many years, Panini obtained mainly from Fanatics. Compl. ¶ 119. Invoices and purchase orders confirm that Panini purchased these jerseys through one of Fanatics's Florida offices. Ex. 45. But no more. As part of its pressure campaign against Panini, Fanatics threatened in May 2023 that it would no longer supply Panini with any jerseys for Panini to offer to consumers as elements of its trading cards. Compl. ¶ 120.

In short, the unlawful conduct giving rise to this litigation took place in this district and therefore the "locus of operative facts favors Florida.'" *Moccio v. Bossbabe Societe, Inc.*, 2021 WL 4847034, at *6–7 (M.D. Fla. Oct. 18, 2021) (Mizelle, J.). Fanatics's acquisition of Topps and GCP does not change this conclusion simply because those companies are not in Florida. Like the other elements of Fanatics's anticompetitive conduct, these acts were carried out while Fanatics operated from Florida (as it has since 1995).

10

Trial efficiency and the interests of justice, or Factor (9), also favor Florida over New York. Because Fanatics was headquartered in this State at least during the key events detailed in Panini's complaint, allowing this case to remain here will promote the interests of justice. Fanatics recognizes (at 17) that "the federal district in which a company is headquartered has a unique and compelling interest in adjudicating claims relating to that company."[9] Of course, once again, Fanatics's argument rests on its claim that it is headquartered in New York, and not Florida, but its public statements and representations, including in court and SEC filings, show otherwise.

Trying this case here is also far more efficient. Civil dockets show a much quicker time to trial in the Middle District of Florida than in the Southern District of New York. *See* Ex. 46. As of June 30, 2023, the median time to trial for civil cases in S.D.N.Y. is 47 months (well above the national median of 35.7 months) *Id.*, at 1-2. By contrast, the median time to trial for civil cases here in M.D. Fla. is 34.3 months, *id.*, at 3, which is below the national median. This "statistical difference in time to trial … weighs against transfer." Order, *Restorative Care of Am., Inc. v. Josloff*, Case No. 8:22-cv-1404-KKM-AEP (M.D. Fla. Feb. 15, 2023), ECF No. 50 at 17 ("Restorative Care") (denying motion to transfer) (Mizelle, J.).

---

[9] *See also* Williams, 2020 WL 12655622, at *2-3 ("Since [the defendant] is headquartered in the [the forum], the forum has an interest in the parties and subject matter" and in resolving the controversy.).

11

Factor (7)—the forum's familiarity with the governing law—also weighs against transfer. While federal courts are generally equally familiar with federal law, Panini's claim under the Florida Deceptive and Unfair Trade Practices Act, Compl. ¶¶ 165-68, as "a practical matter" tips this factor in favor of this District. *Pelc*, 2011 WL 4481571, at *6.

### B. The Remaining Factors Are Neutral

The remaining *Manuel* factors are neutral. As such, they do not provide any reason to upset Panini's choice to bring suit here.

First, contrary to Fanatics's assertions, the convenience of the parties—Factor (3)—***does not*** favor transfer. Consistent with its efforts to downplay its Florida presence, Fanatics contends that New York is more convenient because "key employees" relevant here reside in New York. Mot. 13. But its recent executive hirings outside of New York, not to mention its own website, show that New York is not so key as its motion lets on.[10]

Moreover, although Fanatics declares for purposes of its Motion (at 13) that its Collectibles business is headquartered in New York, its own website tells a different story (much like its SEC filings). Fanatics's website represents

---

[10] Fanatics has recently hired: A CEO for Fanatics Collectibles who works in **Los Angeles**, Exs. 47, 48; a CFO for Fanatics Collectibles who works in **Los Angeles**, Exs. 16, 49; a CEO for Fanatics Live (see Compl. ¶ 134) who works in **Los Angeles**, Exs. 50, 51, 52; a Chief Marketing Officer for Fanatics Collectibles based in **Los Angeles** Exs. 53, 54, 55; a CFO for Fanatics Betting & Gaming who works in **Chicago**, Exs. 56, 57; a Senior Vice President and Head of Investor Relations who works in **Palo Alto**, Exs. 26, 58, 59; a CFO for Commerce who works in **San Francisco**, Exs. 60, 61; and a Chief People Officer for Fanatics Holdings who works in **Fort Lauderdale**, Exs. 62, 63.

12

to customers and investors that its Collectibles business is now headquartered in Los Angeles, Ex. 64, where its CEO claims to be, Ex. 48. If so, under Fanatics's reasoning, New York has no more claim to this case than California. In fact, of the sixty available jobs in the Collectibles business that Fanatics lists on its website, only thirteen are based in New York. Ex. 65. And as far as Fanatics's broader workforce is concerned, out of the 273 total job listings across the Fanatics enterprise, only twenty-four are in New York. Ex. 66.

The fact is Fanatics has no idea where it plans to stick any of its new business lines. In that sense, Fanatics's Twitter (or X) page offers the greatest accuracy: It declares Fanatics is located "everywhere." Ex. 67.

For all these reasons, Fanatics's claim that New York is substantially more convenient than Florida is meritless. Even assuming Fanatics's key witnesses reside in or around New York, that does not favor transfer because their depositions can still occur in New York. And because Fanatics employs them, "their presence at trial can be obtained by [Fanatics]," thus "diminish[ing]" the significance of this factor. *Trinity Christian Ctr. of Santa Ana, Inc. v. New Frontier Media, Inc.*, 761 F. Supp. 2d 1322, 1327 (M.D. Fla. 2010).

Nor is New York more convenient for Panini than Florida. Fanatics does not contend otherwise, recognizing (at 14) that many of the party witnesses that Panini expects to testify do not live in New York. Moreover, Panini's

13

outside legal team is in Florida, New York, and other States. Thus, on balance, the convenience of the parties "is a neutral factor." *Calibre CPA Grp., PLLC v. Novak & Francella*, LLC, 2003 WL 22118937, at *3 (N.D. Ill. Sep. 12, 2003).

So, too, for the convenience of third-party witnesses and compulsory-process availability, or Factors (1) and (5): they are both neutral and neither supports Fanatics's position. While Fanatics contends these factors favor transfer because five of the six licensors in the relevant market are headquartered in New York, it has not identified any third-party witnesses or supported its assertion that third-party witnesses located in New York may be unwilling to testify in Florida. Fanatics's "gestures of calling unknown and unnamed witnesses do not establish" that New York outweighs Florida. *Wall v. Fla.*, 2022 WL 4134579, at *3 (M.D. Fla. Sept. 12, 2022) (Mizelle, J.). This Court and others have concluded the materiality of witness testimony "is impossible to assess without some identification of who they might be." *Id.* (collecting cases). And "[a]ny witness who is unwilling to testify in Florida can be deposed in New York." *Pelc*, 2011 WL 4481571, at *7. Fanatics "has not shown that its New York witnesses cannot effectively present their testimony by deposition[.]" *Id.* These factors are neutral. *Id.*[11]

---

[11] *See also Plain Bay Sales, LLC v. Gallaher*, 2018 WL 8899305, at *3 (S.D. Fla. July 11, 2018) ("Because some witnesses will be inconvenienced regardless of the location of trial, and the witnesses in California are capable of travelling to Florida, the convenience of witnesses does not weigh in favor of a transfer.").

14

<u>Lastly, Fanatics acknowledges (at 18) that Factor (6)—the relative means of the parties—is neutral</u>. <u>Factor (2), or the location of documents and relative access to sources of proof, is neutral as well</u>. In a case like this between two sophisticated parties that will involve substantial electronic discovery and little, if any, paper discovery, this factor is "irrelevant." *Restorative Care,* at 15.

## II.   The NDA Forum-selection Clause is Inapplicable Here

In a separate effort to avoid its Florida ties, Fanatics relies on a forum-selection clause in an agreement that expires in less than two months[12] and has nothing to do with the claims here. That clause is part of an NDA that governs the parties' obligations to keep confidential certain materials exchanged during the parties' negotiations over certain trading-card-licensing rights. The parties agreed to submit disputes related to the ***"subject matter" of the NDA***—*i.e.,* the parties' non-disclosure and confidentiality obligations. *See* Ex. 68 at 5. Nothing in that NDA purports to cover disputes between the parties over the licenses themselves, which are not even specifically referenced in the agreement.

Other courts have dismissed arguments like Fanatics's that try to extend NDA forum-selection clauses to disputes unrelated to the parties' obligations under an NDA. In *In re Orange*, for instance, the defendant argued that a

---

[12] *See* Ex. 68, at 4 ([E]ach Party's obligations under this Agreement shall expire 18 months after [April 12, 2022].").

15

forum-selection clause in the parties' NDA—which was worded similarly to the one that Fanatics relies on—applied to plaintiff's Computer Fraud and Abuse Act claim and various State-law claims. 818 F.3d at 962. The Ninth Circuit rejected this argument because plaintiff had not sued "for breach of the NDA, or for disclosures that were made pursuant to the covered negotiations," and emphasized that "[n]othing in the claims required the district court to interpret, let alone reference, the NDA to issue a ruling on [plaintiff's] claims." *Id*. Likewise, in *Seeberger Enters., Inc. v. Mike Thompson Recreational Vehicles, Inc.*, the court rejected defendant's effort to extend a forum-selection clause in an NDA to plaintiff's claims over its rights to license and market software, noting that this dispute did not implicate the NDA. 502 F. Supp. 2d 531, 536-38 (W.D. Tex. 2007). The same is true here: nothing about Panini's claims requires the Court to reference, interpret, or even consider the NDA.

None of the cases that Fanatics claims (at 8-9) are analogous involved forum-selection clauses in NDAs. Fanatics mainly relies on *Stewart Org., Inc. v. Ricoh Corp.*, which held that a forum-selection clause in a sales contract between a dealer and manufacturer was broad enough to cover "any dispute arising out of or in connection with the dealer—manufacturer relationship." 810 F.2d 1066, 1070 (11th Cir. 1987) (en banc) (per curiam). This was because the subject matter of the sales contract was the "business relationship" between the parties. *Id*. That contract was not narrowly limited to a single

16

aspect of the parties' relationship, as is the case here, where the NDA deals only with the parties' agreement to maintain the confidentiality of information exchanged during a transaction that never happened. The other cases cited by Fanatics are distinguishable for similar reasons—all involved agreements broader than the NDA and claims that were plausibly related to topics covered by the NDA.[13] In short, no forum-selection clause applies to the claims here.

## CONCLUSION

In sum, Fanatics has fallen far short of establishing that the balance of factors "weighs strongly in favor of transfer." *Bossbabe*, 2021 WL 4847034, at *7. At best, Fanatics has highlighted various issues that touched multiple venues. But the fact remains that, at a minimum, the "crux" of Fanatics's unlawful, anticompetitive conduct occurred while it was based in ***Florida***. Panini respectfully requests that the Court reject this failed effort to displace Panini's appropriate choice of the Middle District of Florida as the venue for this litigation.

---

[13] *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162-63 (11th Cir. 2009) (broad choice of law provision in shipbuilding contract applied to claims for injuries caused by ship part constructed by defendant as part of the agreement); *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 444-45 (5th Cir. 2008) (legal malpractice suit subject to forum-selection clause in attorney-client contract because suit was ultimately "about the failure of [attorney] to fulfill his contractual obligations" as plaintiffs' attorney); *Pods, Inc. v. Paysource, Inc.,* 2006 WL 1382099, at *1-3 (M.D. Fla. May 19, 2006) (forum selection clause in contract to administer health plan applied to dispute over the procuring of the health plan); *CVS Pharmacy, Inc. v. AstraZeneca Pharms. L.P.*, 2020 WL 4671659, at *5 (S.D.N.Y. Aug. 12, 2020) (antitrust claims based on conspiracy to increase drug price subject to forum selection clauses in agreement covering purchases of branded version of drug from defendant).

17

August 28, 2023

Respectfully submitted,

/s/ Stuart H. Singer

| | |
|---|---|
| David Boies* *Lead Counsel* | Stuart H. Singer (FBN 377325) |
| **Boies Schiller Flexner LLP** | Jesse Panuccio (FBN 31401) |
| 333 Main Street | Sabria A. McElroy (FBN 95657) |
| Armonk, NY 10504 | Jason Hilborn (FBN 1008829) |
| (914) 749-8200 | **Boies Schiller Flexner LLP** |
| dboies@bsfllp.com | 401 E. Las Olas Blvd., Suite 1200 |
| | Fort Lauderdale, FL 33301 |
| Sean Phillips Rodriguez* | (954) 356-0011 |
| **Boies Schiller Flexner LLP** | ssinger@bsfllp.com |
| 44 Montgomery Street, 41st Floor | jpanuccio@bsfllp.com |
| San Francisco, CA 94104 | smcelroy@bsfllp.com |
| (415) 293-6800 | jhilborn@bsfllp.com |
| srodriguez@bsfllp.com | |
| | Gary L. Sasso (FBN 622575) |
| James P. Denvir* | D. Matthew Allen (FBN 866326) |
| Richard A. Feinstein* | John E. Clabby (FBN 113664) |
| **Boies Schiller Flexner LLP** | Sarah J. Barney (FBN 1041254) |
| 1401 New York Ave, NW | **Carlton Fields, P.A.** |
| Washington, DC 20005 | 4221 W. Boy Scout Blvd., Suite 1000 |
| (202) 237-2727 | Tampa, FL 33607 |
| jdenvir@bsfllp.com | (813) 223-7000 |
| rfeinstein@bsfllp.com | gsasso@carltonfields.com |
| | mallen@carltonfields.com |
| *Admitted pro hac vice | jclabby@carltonfields.com |
| | sbarney@carltonfields.com |

*Counsel for Panini America, Inc.*

## CERTIFICATE OF SERVICE

I certify that on August 28, 2023, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Stuart H. Singer
Stuart H. Singer